Chicago & Milwaukee Telegraph Company v. Type Telegraph Company, The Printing Telegraph News Company et al.

### Gen. No. 13,398.

1. CORPORATION—*what not ultra vires.* A telegraph company authorized by its charter to do a telegraph business may properly acquire, by contract or lease, a right to use the wire facilities of another telegraph company.

2. CORPORATION—*when guarantee not ultra vires.* A guarantee by a telegraph company is not *ultra vires*, where though in form but a collateral undertaking, it is in reality an original one.

3. CORPORATION—*when authority of officers to bind, cannot be questioned.* The authority of a vice-president and secretary to bind a corporation by a contract cannot be questioned where such vice-president and secretary practically control the corporation for which they acted and where it appears that the corporation for years acquiesced in the guarantee and received the benefit of the original undertaking supported by the guaranty sought to be questioned.

4. CORPORATION—*how statute requiring obtaining of license, etc.,*

*construed.* The statute which requires the obtaining by corporations of a license, etc., should be liberally construed, and unless such corporations come within the plain provisions of the act; the act should not be so construed as to nullify their contracts and deprive them of their legal remedies.

5.. CORPORATION—*who cannot complain of excessive exercise of power.* The state alone can complain where a corporation authorized to lease property suitable for telegraphic purposes, so far as necessary to the proper conduct of its business, leases more of such property than is necessary for that purpose.

6. LANDLORD AND TENANT—*effect of assignment of lease upon covenant to pay rent.* An assignment of a lease with the assent of the lessor does not release the lessee, but both the lessee and the assignee are liable for the rent, and this is true even though the lessor accepts rent from the assignee where there was no intention upon the part of the lessor to release the lessee and accept the assignee in his place.

Bill for accounting. Appeal from the Circuit Court of Cook county; the Hon. THOMAS G. WINDES, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1906. Affirmed. Opinion filed November 8, 1907.

Statement by the Court. The Printing Telegraph News Company, prior to July 24, 1900, was engaged in the ticker business in Chicago. From its main office, which was located in the Rialto building, it distributed news to its customers by means of underground cables and overhead wires. From the terminal in the main office a large cable ran north to Jackson boulevard, where the cable divided into two sections. One section, containing fifty-two wires and three large motor wires, ran east on Jackson boulevard to Dearborn street and then north on Dearborn street to Washington street. The other section, containing fifty-four wires, ran north on LaSalle street to Washington street. From these main cables short branch lines, called laterals, were run into the buildings along LaSalle and Dearborn streets in which offices of customers were located. A lateral connecting a building with a main cable terminated in a cable-head, which was generally placed at the entrance of the building. From the cable-head a small wire led

to the offices of the customers in the building. There were also pony wires or short lines running from the main office direct to a customer's office or from one customer's office to another.

By these wires the Printing Telegraph News Company transmitted to its customers sporting news and grain market and Board of Trade quotations and gossip. The news was received in the offices of the customers by means of instruments called tickers, which printed the news in typewriting as it was received.

The underground ducts in which the cables were placed were owned by a company which leased to the Printing Telegraph News Company the space occupied by its wires.

The Chicago & Milwaukee Telegraph Company operated a telegraph line between Chicago and Milwaukee. In July, 1900, its main office was in the Board of Trade Building (which is the next building north of the Rialto Building), and at that time the only wires it had in the city of Chicago were a few wires in the Board of Trade Building, and a seven-wire cable running north on LaSalle street.

By a lease dated July 24, 1900, between the Chicago & Milwaukee Telegraph Company, as party of the first part, and the Printing Telegraph News Company, as party of the second part, the Printing Telegraph News Company leased its entire plant to the Chicago & Milwaukee Telegraph Company for a term of twenty years at a rental of $6,000 per annum, payable in installments of $500 per month, on or before noon of the tenth day of each month, the first month's rent to be paid on the signing of the contract, the second month's rent to be paid on the tenth day of October following, and subsequent payments to be made on the tenth day of each month thereafter.

The first party agreed to assume the leases of the second party for the rental of the offices occupied by the second party and the lease of the ducts containing the cables of the second party.

The first party agreed to pay a royalty of $5 per annum on each and every instrument constructed under the Essick patents, and to be supplied to the second party, but no royalty was to be paid by the first party on the instruments turned over under the lease. The lease contained the following covenant:

"It is mutually agreed by and between the parties hereto, that the Chicago & Milwaukee Telegraph Company shall have the right to assign this contract on or before the first day of September, 1900, to a company now organized or to be organized, provided that the company to which such assignment is made shall be owned and controlled by L. M. Martin, W. R. Stewart, Jr., and F. E. Crawford, and shall have the right to operate in Illinois."

The lease was signed in behalf of the Chicago & Milwaukee Telegraph Company by William R. Stewart, Jr., its vice president, and F. E. Crawford, its secretary, and its corporate seal was attached, and in behalf of the Printing Telegraph News Company by Orlando H. Smith, its president, and John A. Grant, its secretary and treasurer, and its corporate seal was attached.

On August 1, 1900, the Printing Telegraph News Company turned over to the Chicago & Milwaukee Telegraph Company under the lease, all its property in Chicago, its office lease and its duct lease. At the time of the transfer, its main office was in the Board of Trade Building. Immediately after the transfer it took possession of the office of the Printing Telegraph News Company and used it as its main office, retaining an office in the Board of Trade Building on account of its business on the Board of Trade; and it pulled the Printing Telegraph News Company's cable out of the Rialto Building and ran it into the Board of Trade Building, connecting it with its office in that building.

After the leased property was transferred to the Chicago & Milwaukee Telegraph Company, the Na-

tional Telegraph News Company was organized. All its capital stock was held by William R. Stewart, Jr., F. E. Crawford and L. M. Martin from the beginning. An alleged assignment of the lease was made from the Chicago & Milwaukee Telegraph Company to Stewart, Jr., Crawford and Martin, and they made an alleged assignment of it to the National Telegraph News Company. The alleged assignment to the National Telegraph News Company is claimed to have been made on August 31, 1900.

The Midland Telegraph Company, the complainant in this case, was organized by Stewart, Crawford and Martin, and its charter authorized it to carry on a telegraph and telephone business, and *to hold stock in other telegraph and telephone companies.* It was evidently organized merely as a "holding" company. Stewart, Crawford and Martin, who held the bulk of the stock of the Chicago & Milwaukee Telegraph Company, transferred their stock in the Chicago & Milwaukee Telegraph Company in exchange for the entire capital stock of the Midland Telegraph Company, and in this way the Midland Telegraph Company became the nominal owner of all but about eleven shares of the stock of the Chicago & Milwaukee Telegraph Company, and then issued bonds and pledged the stock as security for the payment of them.

The officers of the Chicago & Milwaukee Telegraph Company were A. McD. Young, president; William R. Stewart, Jr., vice president and manager, and F. E. Crawford, secretary and treasurer. Young was only a figure-head and took no active interest in the management of the company. Its real head was Stewart, the vice-president. The officers of the National Telegraph News Company were William R. Stewart, Jr., president, and F. E. Crawford, secretary and treasurer. The officers of the Midland Telegraph Company were William R. Stewart, Jr., president, and F. E. Crawford, secretary.

As soon as the Chicago & Milwaukee Telegraph

Company took possession of the leased property it began to use the office furniture and such of the wires as its business needs required in its telegraphic business. From the time the leased property was turned over to that company until the alleged assignment of the lease to the National Telegraph News Company, the Chicago & Milwaukee Telegraph Company operated the ticker plant in connection with its telegraph business in its own name, but it is claimed by appellant that after September 1, 1900, the ticker business was operated by the National Telegraph News Company and not by the Chicago & Milwaukee Telegraph Company. All the time the ticker business was operated in the name of the National Telegraph News Company, however, the two companies, the Chicago & Milwaukee Telegraph Company and the National Telegraph News Company, occupied the same office, used the leased furniture together and employed bookkeepers, linemen and other help in common, and the Chicago & Milwaukee Telegraph Company continued to use as many of the leased wires for its own telegraphic purposes as its requirements demanded.

To such an extent was the commingling of the properties of the two companies carried that employes did not know which company paid them, and the two companies even made free use of each other's funds (when either company happened to have any). Brown says: "There were times when one company, the Chicago & Milwaukee Telegraph Company, would have money in the treasury, and then at other times the National Telegraph News Company would have money in the treasury, so that when one fund was low they would take and pay their debts out of the other."

This is an appeal from a decree allowing two separate claims against the appellant, the Chicago & Milwaukee Telegraph Company—one in favor of appellee, the Type Telegraph Company, and the other in favor of appellee, the Printing Telegraph News Company. The two claims, however, are separate and distinct,

and while some of the evidence has a bearing upon both claims, and while certain defenses are made to both claims, certain questions arise in regard to the claim of the Type Telegraph Company which do not arise in regard to the claim of the Printing Telegraph News Company.

On January 7, 1905, the Midland Telegraph Company filed the bill of complaint in this case, alleging in substance that complainant was incorporated for the purpose of obtaining and operating telegraph lines; that for this purpose it borrowed on its bonds about $50,000, which came into the charge of its officials to be devoted to its use, but that they disposed of it without authority, and in violation of their duty to complainant.

That the defendant, National Telegraph News Company, an Illinois corporation, controls telegraphic wires and apparatus known as "tickers" and "electrical clocks" in Chicago and Milwaukee, also privileges of collecting news on the Board of Trade in Chicago.

That the Chicago & Milwaukee Telegraph Company, a Wisconsin corporation, operates a line of telegraph from Chicago to Milwaukee, with offices in said cities and appropriate apparatus and equipment costing a large sum of money.

That under date of July 24, 1900, the Printing Telegraph News Company, a New York corporation, leased to the Chicago & Milwaukee Telegraph Company for twenty years, at a rental of $500 per month, certain telegraphic apparatus, wires, instruments and facilities in Chicago and Milwaukee; that said lease was forthwith assigned to sundry assignees, and by them assigned by an instrument dated August 27, 1900, to said National Telegraph News Company, which now uses and operates said wires and facilities under said lease.   Certain alleged provisions of said lease are set forth.

That on August 31, 1900, the Type Telegraph Com-

pany leased to W. R. Stewart, Fred E. Crawford and others certain wires and telegraphic apparatus, instruments and equipments in the cities of Chicago and Milwaukee for a period of twenty years at an annual rental of $2,000.

That all these corporations and individuals, except the complainant, have combined, mingled and consolidated all the devices, apparatus, wires, instruments and facilities mentioned, into one system; operate them as such and have expended thereon over $35,000 of the money realized from the sale of the complainant's bonds; that this consolidation is almost entirely the product of the expenditure of this $35,000, and that the properties belong to complainant.

That the Type Telegraph Company, Chicago & Milwaukee Telegraph Company, W. R. Stewart, Fred E. Crawford and National Telegraph News Company knew that the expenditure of this $35,000 was improper and unauthorized.

That the National Telegraph News Company and the Chicago & Milwaukee Telegraph News Company are insolvent, and that the Printing Telegraph News Company asserts that sundry rentals are due and unpaid under its said lease, and threatens to enter upon and seize the wires, instruments and apparatus to satisfy said rentals.

Bill prays an accounting to ascertain where the $35,000 has been expended, who is liable therefor; that a receiver be appointed to take charge of and control the business of all of the companies mentioned and that the said Midland Company, complainant, may have an accounting against and with and from all of the individuals and corporations and each of them anywhere mentioned in the said bill of complaint, to ascertain how much of the proceeds of complainant's said bonds was expended on the combined property aforesaid, and what portion of such combined property and who of said corporations and individuals should be held for the various parts of such expendi-

tures; that an injunction issue against the Printing Telegraph News Company, the Type Telegraph Company, their attorneys, agents and officers, preventing them or any of them from in any manner taking possession of or seizing any of the articles and property anywhere mentioned in the said bill of complaint or entering upon or seizing the premises mentioned, and asks that summons issue against the National Telegraph News Company, the Chicago & Milwaukee Telegraph Company, the Type Telegraph Company, W. R. Stewart, Fred E. Crawford and the Printing Telegraph News Company.

Upon the filing of the bill the Hibernian Banking Association was appointed receiver of the assets of the Chicago & Milwaukee Telegraph Company and the National Telegraph News Company.

On January 16, 1905, the Printing Telegraph News Company filed its answer to the bill, in which it set up that it is an Illinois corporation; that it controls telegraph wires and tickers and electrical clocks in Chicago and Milwaukee.

That the Chicago & Milwaukee Telegraph Company is a corporation organized under the laws of the State of Wisconsin, and is operating a line of telegraph between Chicago and Milwaukee, and in connection therewith has offices in Chicago and Milwaukee; that the Printing Telegraph News Company executed a certain contract of lease to the Chicago & Milwaukee Telegraph Company under date of July 24, 1900; denies that the property thereby leased was situated partly in Milwaukee and partly in Chicago; avers that at the time of the making of the lease and for a long time prior thereto this defendant was engaged in the business of collecting and distributing commercial and financial news in the said city of Chicago, and for the conduct of the said business owned and operated within Chicago certain telegraph lines consisting partly of overhead wires in certain parts of said city, and partly of cables in ducts in certain streets of said

city, and the use of such ducts for that purpose, having been leased by the owner thereof to this defendant under certain lease or leases which at the time of the making of the said contract with the said Chicago & Milwaukee Telegraph Company had not yet expired, and in connection with the operation of the said telegraph lines this defendant owned and used printing telegraph instruments, switchboards, generators, tools and other machinery, and leased and occupied certain offices in the city of Chicago in the building known as the Rialto Building, under certain lease or leases, which at the time of the making of the said contract with the Chicago & Milwaukee Telegraph Company had not expired.

That this defendant was also engaged at that time in the manufacture of Essick Page printing and telegraph instruments. The contract between the said Chicago & Milwaukee Telegraph Company and the defendant, the Printing Telegraph News Company, was as follows, to wit: Dated July 24, 1900, between Chicago & Milwaukee Telegraph Company, known as the party of the first part, and Printing Telegraph News Company, known as party of the second part.

"Whereas, party of first part desires to engage in the business of collecting and distributing financial, commercial, grain and sporting news in Chicago and Milwaukee, and has acquired under contract with the Type Telegraph Company, its business in so far as it controls the collection and distribution of financial, commercial and sporting news in the said cities by means of the Page printing telegraph instrument, known as the Wright Page Printing Telegraph Instrument; and

Whereas, party of second part is at present engaged in the collection and distribution of commercial and financial news in Chicago and in other cities by means of the printing telegraph instrument known as the Essick Page printing telegraph and are also engaged in the manufacture of said instrument and control

patents covering the same and all improvements thereon;

And, Whereas, party of first part desires to lease for the term of twenty years the business of party of the second part in Chicago, together with the exclusive right to use said Page printing telegraph instrument, known as the Essick Page Printer, and the improvements thereon in the cities of Chicago and Milwaukee.

Therefore, it is agreed:

1st. First party leases the said business of the second party in Chicago with the exclusive right to use the Essick Page Printer in Chicago and Milwaukee for a term of twenty years and agrees to pay to said second party a rental of $6,000 per annum, payable in monthly installments of $500 each, on or before noon of the tenth day of each month.

2nd. First party agrees to furnish security for fulfillment of contract in a bond of a surety company doing business in Illinois, acceptable to second party, in the sum of $25,000, the bond to be renewed at the expiration of every three years.

In case of failure to renew works a forfeiture authorizing party of second part to take possession of the business as provided in paragraph 5.

3rd. First party agrees to assume the leases of second party for rental of offices, also the leases of ducts containing cables belonging to second party in Chicago.

4th. First party agrees that on completion of this contract and the delivery of the property of second party a list shall be made and delivered to the party of the second part of all printing telegraph instruments, with numbers attached, and that an inventory shall be made of all other properties turned over, such as switchboards, generators, tools, furniture and machinery, with estimated value attached. First party agrees to maintain property of the second party in good condition, excepting ordinary wear and tear.

5th. Second party has the right on thirty days' notice to take possession of the leased property and the business as conducted by first party in case of

default in the payment of rent, and operate business and apply net profit of same to payment of rent, but this clause shall not bar or prevent second party from commencing any legal suits or proceedings, nor shall such taking possession release first party or surety.

6th. First party agrees to render monthly statements of business, showing gross receipts, expenses and net profits. Second party shall have the right on thirty days' notice to take possession of the business and apply net profits to payment of rentals in case statements show deterioration in business.

7th. In case second party should take possession under the preceding clause and first party should fail to remove the cause therefor within three months, option given to second party to declare the lease terminated and forfeited.

8th. Second party shall have the exclusive right, free of expense, to all news gathered by first party except grain quotations and statistical news gathered by the Board of Trade for use by second party at any point in the United States except in the cities of Chicago and Milwaukee. Second party shall have the right to put a representative and also a telegraph operator in the news office of first party, together with wires and instruments necessary for such operation.

9th. Second party agrees to turn over its entire business in Chicago to first party, including its offices and news facilities, overhead wires, cables, etc., except books and accounts. on August 1, 1900, on delivery of bond and payment of first month's rent; agrees that first party shall have possession so long as it pays the rental; ownership of leased property to remain in second party.

10th. Second party agrees to repair telegraph instruments, charging first party therefor the cost plus ten per cent. and transportation charges.

11th. Second party agrees to furnish new instruments for $65, actual cost of construction.

12th. First party agrees to pay royalty of $5.00 per annum on every instrument constructed under the Essick patent supplied by party of second part, except instruments delivered to first party under the lease.

13th.  Agreed that the Chicago & Milwaukee Telegraph Company shall have a right to assign this contract on or before the 1st day of September, 1900, to a Company now organized or to be organized, provided that the Company to which such assignment is made shall be owned and controlled by Messrs. L. M. Martin, W. R. Stewart, Jr., and F. E. Crawford, and shall have the right to operate in the State of Illinois.

Signed and sealed by

CHICAGO & MILWAUKEE TELEGRAPH COMPANY.

By WILLIAM R. STEWART,
Its Vice-President.
F. E. CRAWFORD,
Secretary.

PRINTING TELEGRAPH NEWS COMPANY.

By ORLANDO J. SMITH,
President.
JOHN H. GRANT,
Secretary and Treasurer.''

Avers that at time of execution and delivery of lease and as part of same transaction Chicago & Milwaukee Telegraph Company as principal and Pacific Surety Company as surety executed and delivered to Printing Telegraph News Company a bond which is set out in full to secure the performance of the lease by the Chicago & Milwaukee Telegraph Company for three years.

Denies that the said lease was assigned to sundry assignees and by them assigned to the National Telegraph News Company. Avers that Chicago & Milwaukee Telegraph Company purported to transfer and assign the lease to the National Telegraph News Company, owned and controlled by Martin, Stewart and Crawford, but that the Chicago & Milwaukee Telegraph Company has never been released from its liability but remains liable to the defendant under the lease.

Avers that the rental was paid up to June 1, 1904, but that no part has been paid since then, leaving

$3,500 still due, with interest on each month's rent since it became due.

Avers that on August 15, 1904, Chicago & Milwaukee Telegraph Company executed and delivered to this defendant a check for $500 on rent then unpaid. Said check was not paid.

Avers that on October 26, 1904, the Chicago & Milwaukee Telegraph Company delivered its note of $2,000, payable to the order of this defendant, the note being dated October 6, 1904. The note remains unpaid.

Denies all connection with alleged mingling and consolidation of the property, or misuse of funds.

Avers that the Midland Telegraph Company was organized by Martin, Stewart and Crawford, for the purpose of carrying on a telegraph and telephone business and holding stock in other telegraph and telephone companies, and for the purpose, principally, if not solely, of obtaining control of the capital stock of the Chicago & Milwaukee Telegraph Company and borrowing money upon the same as collateral security, thus enabling the Chicago & Milwaukee Telegraph Company to do indirectly what it could not do directly, it being prohibited by law from pledging or otherwise encumbering its property as security.

Avers that Stewart and Crawford transferred ninety-eight and one-half per cent. of the capital stock of the Chicago & Milwaukee Telegraph Company to the Midland Telegraph Company, and that in consideration thereof all the capital stock of the Midland Telegraph Company and $50,000 of its bonds were transferred to Stewart and Crawford.

Avers that the Midland Telegraph Company, the Chicago & Milwaukee Telegraph Company, and the National Telegraph News Company are substantially owned and controlled by Martin, Stewart and Crawford for the purpose of carrying on one and the same business.

Avers on information and belief that the Common-

wealth Trust Company holds a majority of the capital stock of the Midland Telegraph Company and the National Telegraph News Company as collateral security to secure the note of the Chicago & Milwaukee Telegraph Company for $20,000.

Alleges no knowledge as to whether the Chicago & Milwaukee Telegraph Company and the National Telegraph News Company are insolvent. Avers that suit was commenced and a receiver appointed at the instance of Martin, Stewart and Crawford in name of Midland Telegraph Company, for the purpose of placing the property of the Chicago & Milwaukee Telegraph Company and the National Telegraph News Company and the Midland Telegraph Company beyond the reach of their creditors.

The answer of the Type Telegraph Company to the bill, filed March 31, 1905, admits that the Chicago & Milwaukee Telegraph Company is a corporation of Wisconsin and is operating a telegraph line from Chicago to Milwaukee, and has offices in Chicago and Milwaukee; admits that under date of August 31, 1900, it executed a lease to Martin, Stewart and Crawford; avers that at the time of making the lease it owned certain telegraph lines in the city of Chicago, and certain cables and ducts in certain streets in said city, and that it owned certain printing telegraph instruments, transmitters, condensors, tools and other machines; that it was engaged in the manufacture of certain printing telegraph instruments known as the Wright Page Printer, and had control of the patents; that at the time of making a lease defendant owned all of the property covered by the lease. The lease was guaranteed by the Chicago & Milwaukee Telegraph Company. The lease is as follows:

Contract made in duplicate 31st of August, 1900, by and between the Type Telegraph Company, first party, L. M. Martin, W. R. Stewart, Jr., and F. E. Crawford, second party, witnesseth:

First party, Type Telegraph Company, leases to the

second party, Martin, Stewart and Crawford, for twenty years from August 1, 1900, all the small Page printers now owned and all wire facilities, transmitting apparatus and equipment owned by it, and located in Chicago, Illinois, and Milwaukee, Wisconsin, except such wire facilities, terminal and transmitting apparatus and property as said first party owns in Chicago, used and intended to be used in connection with its quotation service.

Not intended to lease any property, facilities, terminal and transmitting or other apparatus owned by first party in Chicago and used or intended or needed to be used by first party in connection with the quotation service, facilities for which the first party has connected with one John A. Bonnell to supply.

Terms of the lease are as follows:

1st. Second party to keep machines, equipment, and property in good order and repair at own expense and insure it for the benefit of first party, said property and equipment at all times to be and remain the property of the first party.

2nd. Second party shall pay first party for the use of the machines $2,000 per annum on the first days of January and July of each year during this lease.

Second party shall have the right to use small Page printers and transmitting apparatus owned by first party free from all further royalties, and shall have the right to use on said machines and said transmitting apparatus and apply throughout all improvements to be made at the expense of said second party.

3rd. In case of default in payment of rent for a period of ninety days, first party shall have the option to terminate or continue the lease and collect the rent due.

4th. Second party shall have the exclusive right to use small Page printers and apparatus connected therewith for the purpose of carrying on and providing a financial news service in Chicago and Milwaukee, such as heretofore has been carried on by the party

of the first part with said small Page printers, and said second party shall also have the exclusive right to use said small Page printers and said apparatus in any other cities than Chicago and Milwaukee, provided said service does not in any wise interfere with or come in competition with the quotation service in Chicago, in which said first party is interested by virtue of its contract with Bonnell. Service carried on and done by means of the small Page printers must in no way compete with the quotation service established by first party in Chicago or Milwaukee.

5th. Second party to buy additional apparatus needed of first party.

Receive royalty for such machines delivered.

Signatures:

> L. M. MARTIN,
> W. R. STEWART, JR.,
> F. E. CRAWFORD,
> TYPE TELEGRAPH COMPANY,
>> By GEORGE B. SOLDERS,
>>> President.
>> ALLEN A. ODELL,
>>> Secretary.
>>> August 31, 1900.

The Chicago and Milwaukee Telegraph Company hereby guarantees that L. M. Martin, W. R. Stewart, Jr., and F. E. Crawford, parties of the second part in the foregoing contract, will perform said contract and discharge the same according to the terms thereof.

> CHICAGO AND MILWAUKEE TELEGRAPH CO.
>> By W. R. STEWART,
>>> Vice-President.
> CHICAGO AND MILWAUKEE TELEGRAPH CO.
>> By F. E. CRAWFORD,
>>> Secretary.

(CORPORATE SEAL.)

Avers that defendant has complied with the covenants and agreements of said lease.

That there was due $1,853.31 on the first day of

January, 1905; that the Hibernian Banking Association has had the use of the said property since January 7, 1905, as receiver of the National Telegraph News Company and the Chicago and Milwaukee Telegraph Company.

Denies confederation with other defendants and commingling property as alleged; avers that no part of the $50,000 has been expended upon the property of defendant covered by said lease.

That defendant had nothing whatever to do with the issue or sale of the bonds or any part thereof; avers that on the making of the lease Martin, Stewart and Crawford, the defendant, turned over to lessees all the small Page printers, wire facilities, transmitting apparatus and equipment, which these defendants in and by said lease consented to lease to said Martin, Stewart and Crawford, and that same have ever since been in the possession of said Martin, Stewart and Crawford, or in the possession of said National Telegraph News Company, subtenants of Martin, Stewart and Crawford (but without the knowledge or consent of this defendant); that said property is now in the possession and use of the receiver in this suit; denies that any of the property of defendant belongs to complainant.

Denies knowledge of 50,000 bonds or how the proceeds of the sale of the bonds were used.

The Printing Telegraph News Co. filed a petition on April 13, 1905, setting up the substantial facts averred in its answer as the basis of its claim, and the further fact that the receiver took possession of the property, its agreement to pay $500 per month, and that it had been using the property since its appointment as receiver on January 7, 1905; and praying for an order of court on the receiver to pay $1,500 for the use of the property out of the first funds which should come into its hands as receiver.

The receiver answered the petition of the Printing Telegraph News Co., stating that it had kept the as-

sets of appellant and the National Telegraph News Co. separate and apart; that by reason of the release of the appellant it was not liable under the contract of July 24, 1900; denies that it agreed to pay petitioner for the use of its property as set up in the petition; denies petitioner is entitled to an equitable lien on the property of appellant, and avers petitioner has failed to perform the terms of its contract.

On July 15, 1905, the receiver and the Printing Telegraph News Company agreed upon a compromise, and an order was entered *nunc pro tunc* as of June 20, 1905, which, after reciting that all parties to the suit appeared by their counsel, found that it was equitable in settlement of all claims of the Printing Telegraph News Company against the Chicago & Milwaukee Telegraph Company and National Telegraph News Company except the rent claimed by it for the period from May 31, 1904, to January 7, 1905, that the receiver should pay the Printing Telegraph News Company at the rate of $500 per month from January 7, 1905, to April 7, 1905, and that the latter company should charge no rental or compensation for the use of the property by the receiver subsequent to April 7, 1905. The court then ordered, with the consent of all parties, that there be allowed in favor of the Printing Telegraph News Company against the Chicago & Milwaukee Telegraph Company and the National Telegraph Company and against the receiver of the said two companies, the sum of $500 with interest at five per centum per annum from June 20, 1905, to be paid in due course of administration out of the assets of the two companies, in full satisfaction of all rental or claims for compensation for the use of the property since January 7, 1905.

The receiver was then ordered to turn over to the Printing Telegraph News Company all its property in the receiver's hands, reserving the right of the receiver to use such wires and cables as were then used and operated by the Chicago & Milwaukee Telegraph

Company in connection with its wires until its wires could, within thirty days from June 20, 1905, be disconnected.

The order then terminated the lease of July 24, 1900, as of April 7, 1905, without prejudice to the claim of the Printing Telegraph News Company for the rentals of that company from May 31, 1904, to January 7, 1905, which claim was reserved for future adjudication on a separate hearing upon the petition of the Printing Telegraph News Company "this day filed herein" and the issues to be joined thereon. The order further provided that if the appellant and the National Telegraph News Company or either of them should be found liable for such claim or any part thereof, then so much of said claim as said two companies, or either of them, should be found liable for, should be allowed as a general claim against the company or companies held liable for the same to be paid out of the assets of said company or companies in the hands of the receiver in due course of administration.

On the same day on which the above order was entered the Printing Telegraph News Company filed a petition which set out the lease executed by it to appellant, and the bond given by the Pacific Surety Company in connection with the lease, the assignment of the lease to the National Telegraph News Company prior to May 31, 1904, averring that appellant was never released from its liability under the lease, and that both it and the National Telegraph News Company were liable for the rents which accrued under the lease from May 31, 1904, to January 7, 1905; the turning over of the property under the lease is averred, and that it remained in the possession of appellant or the National Telegraph News Company until the appointment of the receiver, when the receiver took possession thereof and retained possession thereof until it turned it over to petitioner under order of court; that the rents which accrued under the

lease were paid up to June 1, 1904, and that no part of the rents which accrued after that date were paid; avers, that there is due $3,600 with interest on each month's rent since it became due, and prays that the amount due be allowed as a claim against appellant and the National Telegraph News Company to be paid by the receiver in due course of administration from the assets of the said companies, pursuant to the order entered as of June 20, 1905, and for general relief.

Appellant answered the petition setting up its organization, its stockholders and officers, and that the Midland Telegraph Company held all its stock except a few shares, and that in the year 1900 L. M. Martin, W. R. Stewart, Jr., and F. E. Crawford were the owners and holders of all the stock of the Midland Telegraph Company; the purpose of said individuals to organize the National Telegraph News Company, of which they became and continued to be the exclusive controllers and owners; that it was the purpose of said individuals, in July, 1900, to secure a lease of the business of petitioner and transfer it to a ticker corporation afterwards known as the National Telegraph News Company, and that in pursuance of this plan the said lease to appellant was negotiated by said individuals; that appellant never entered upon the property or operated the business transferred by the lease; that on August 27, 1900, the lease was assigned to said individuals and by them assigned on August 31, 1900, to the National Telegraph News Company in consideration of the issuance to the assignors of 1,500 shares of the capital stock of that company; that the purpose of the lease to appellant was to obtain the credit of appellant and that it might stand pledged for the rent; that the use by Martin, Stewart and Crawford of their official positions as officers of appellant in procuring the lease to be taken in the name of appellant was a breach of their fiduciary relations to appellant and a fraud upon appellant and its stockholders, and of all this the petitioner had full knowledge.

On April 24, 1906, the receiver and the National Telegraph News Company also answered the petition, denying liability and the authority of petitioner to sue and averring petitioner was not authorized to do business in Illinois at the time the cause of action arose, and adopted the answer of appellant.

Replications to these answers were filed.

On November 3, 1906, upon the petition of appellant and by consent of all parties except the Printing Telegraph News Company and the Type Telegraph Company the court entered an order that the receiver deliver to appellant all the telegraph lines, apparatus, appliances and property belonging to that company then in the possession of the receiver (other than cash on hand) or which the receiver had acquired in connection with the business of that company, together with the books of account, records, leases and other documents belonging to or connected with the business of that company, which property was to be held by appellant as custodian for the receiver. The order provided that the court retain jurisdiction of said property, so that in case it should sustain, in whole or in part, the claim of the Printing Telegraph News Company for the rent which accrued prior to the appointment of the receiver as a debt or obligation of appellant, and should enter a judgment against appellant for said debt or any part thereof, or in case the court should sustain the claim of the Type Telegraph Company as a debt of appellant and enter judgment against appellant for that debt, the court should have the same power and authority to decree a sale of the property for the payment of the said claims, or either of them, so allowed, as it would have had if said property had remained in the possession of the receiver.

The Type Telegraph Company filed its cross-bill November 4, 1905, alleging ownership of certain specified cables and lateral lines leading to various buildings; avers the execution of the lease of August 31,

1900, with Martin, Stewart and Crawford, setting out the lease; that appellant shortly after the date of the lease began using the leased property; the making of the contract of guaranty by appellant to secure the performance of the lease for the purpose on its part of acquiring said leased property to be used in its business and in that of the National Telegraph News Company; alleges non-payment of the rent under said lease and the facts set out in its answer. The cross-bill makes all the parties to the original bill, the receiver and L. M. Martin parties defendant, and prays for a decree directing appellant, the receiver, Martin, Stewart, Crawford and the National Telegraph News Company to pay the cross-complainant the sum of money due it, and for further relief.

Appellant, the National Telegraph News Company, and the receiver answered the cross-bill, denying liability, the execution of the guaranty, claiming the guaranty was without consideration, and wholly foreign to the business of appellant and outside its charter, and avers that the Type Company never complied with the provisions of the laws of this state under which foreign corporations are authorized to transact business in Illinois.

Replications were filed to the answers to the cross-bill.

No evidence was offered on the hearing in support of the original bill and it was dismissed. The court in its decree sustained the claim of the Printing Telegraph News Company as joint claim against appellant and the National Telegraph News Company for the unpaid rent, with interest, amounting to $3,907.50; it held that Crawford, Stewart and Martin, the lessees of the lease from the Type Telegraph Company, and the National Telegraph News Company, the assignee of the lease, were not liable upon the lease for rent prior to February 6, 1905, the day when the Type Company was licensed to do business in this state, but were liable for $2,706.01, rent which accrued after

that date; that appellant was liable to the type com-
pany for the entire unpaid rent up to the date of the
decree, with interest, amounting to $4,772.39. ·The
court also allowed $499.98 in favor of the type com-
pany as a claim against the receiver of appellant for
rent for April, May and June, 1905.

From this decree appellant only prayed an appeal.
The National Telegraph News Company, the receiver,
the Type Telegraph Company and Martin have as-
signed cross-errors.                                    ·.

TENNEY, COFFEEN, HARDING & WILKERSON, for appel-
lant; HORACE KENT TENNEY and HARRY A. PARKIN, of
counsel.

FYFFE & ADCOCK and HOYNE, O'CONNOR & IRWIN,
for appellees; EDMUND D. ADCOCK and CORNELIUS
LYNDE, of counsel.

MR. JUSTICE SMITH delivered the opinion of the
court.

It is contended on behalf of appellant that the guar-
anty of the lease from the Type Telegraph Company
to Crawford, Stewart and Martin was void, because
the Type Company was a foreign corporation, not au-
thorized to do business in Illinois; second, the guar-
anty being by a corporation of the individual debt of
another person was wholly foreign to the purposes of
appellant's charter and was *ultra vires;* third, the exe-
cution of the guaranty was wholly unauthorized; and
fourth, the contract guaranteed was designed to pre-
vent competition in the furnishing of market quota-
tions.

The Type Telegraph Company is a West Virginia
corporation having its principal place of business at
Cleveland, Ohio. Its charter ·shows that it is organ-
ized, among other things, to gather and distribute
news and construct, operate, own and lease wires,
poles and ducts for the distribution of electric currents
for all purposes, and generally to do all such· other

business as may be necessary or incidental to the full development and prosecution of the business therein described and the purposes specified. The record shows that it had established in Chicago and Milwaukee plants consisting of wires, cables, printing telegraph tickers and other electrical appliances for the operation of tickers. The tickers were placed in the various offices of persons with whom contracts were made for the service. By means of electricity conveyed upon its wires and other electrical appliances there was caused to be written instantly upon a tape of paper the news of messages sent out from a main office to the customer. It had a large system of wires and cables connecting, or immediately available to connect, the important office buildings of the city of Chicago with each other. It had a like system in Milwaukee. The Type Company had the appliances for and was doing a telegraph business. True, it differed somewhat in kind from the usual business conducted by ordinary telegraph companies, but it was essentially a telegraph business, transmitting intelligence between distant points by means of electricity.

The charter of the Type Telegraph Company is broad enough to bring it within the meaning of the word telegraph, as defined by the standard authorities. The business which it conducted and turned over under the lease in question was essentially a telegraph business conducted by and over telegraphic appliances. As said in Northwestern T. E. Co. v. Chicago, M. & St. P. Ry. Co., 76 Minn. 334, at page 344: "In these days there ought to be no one to question the statement that telephone is simply an improved telegraph. The former was originally called the speaking telegraph. The instruments used at the terminals are different, but the poles, the wires, the insulators and the generation of the electric current are all the same." See also Wis. Telephone Co. v. City of Oshkosh, 62 Wis. 32; National Tel. News Co. v. Western U. T. Co., 119 Fed. 294.

We see no reason, either in the definition of a telegraph or in the nature of the business conducted by the Type Telegraph Company, which would prevent appellant company authorized to do a telegraph business from furnishing such information to its customers over its wires as the evidence shows was furnished by the Type Telegraph Company, if the development of commerce has rendered that kind of information valuable to business men. In our opinion, therefore, the Type Telegraph Company is a telegraph company. It follows, we think, that to acquire the right to use the property and wire facilities of the Type Telegraph Company and thus promote and extend its business was within the expressed charter powers of appellant. If the lease had run to appellant as lessee, and appellant had thus become liable to pay the rent for the use of the property of the Type Telegraph Company, it would not have been an invalid contract, because *ultra vires*. The liability, however, took the form of a guaranty of a lease from the Type Telegraph Company to Martin, Stewart and Crawford, and it is contended in behalf of appellant that it did not have the power to make a pure contract of guaranty such as is relied upon in the cross-bill of the Type Telegraph Company. It is argued that the execution of such a guaranty is plainly outside, either of any express power given by appellant's charter, or of any power necessarily implied.

In the argument of this question we think counsel for appellant have placed too much emphasis upon the mere form of the contract, and have lost sight of the substance of the transaction. "What is or what is not too remote must be determined according to the facts of each case. The rule has been stated to be: In exercising powers conferred by its charter that a corporation 'may adopt any proper or convenient means tending directly to their accomplishment, and not amounting to the transaction of a separate unauthorized business.' " Best Brewing Co. v. Klas-

sen, 185 Ill. 37.   We must then recur to the facts
shown by the record which relate to the making of the
lease and guaranty and the object to be obtained.

The evidence in the record shows that the contract
or lease, although in form made with the individuals
Martin, Stewart and Crawford and guaranteed by ap-
pellant, was in fact the contract and obligation of ap-
pellant.   The negotiations for the lease began in July,
1900.   The first written evidence of the negotiations
in the record is a letter dated July 28, 1900, written
by Crawford as superintendent of appellant company
to Solders, president of the Type Telegraph Com-
pany.   This letter was written in response to a letter
from Solders, of July 27th, and refers to a proposi-
tion for a lease of the property of the Type Tele-
graph Company outlined at a previous Cleveland con-
ference.   It states that the Chicago business of the
Telegraph News Company had already been leased
by appellant, but that it had not been done until they
believed that the Type Telegraph Company was per-
fectly willing to make the contract with appellant
at $2,000 per year.   The letter shows clearly that
it was the intention of appellant to lease the prop-
erty.   That it was so understood by the directors
of the Type Telegraph Company appears from their
action on July 31, 1900, upon the receipt of the
letter, in passing a resolution authorizing the leasing
of the property to appellant.   That the lease was
finally made to Martin, Stewart and Crawford and
guaranteed by appellant, was due to the request of
Crawford and Stewart, according to the testimony of
Solders and Tilden.   The Type Company knew noth-
ing of the responsibility of the individuals, but was
willing to make the lease in that form, provided ap-
pellant would guarantee its fulfillment and perform-
ance.

In this connection it should be observed that the
lease dated July 24, 1900, between appellant and the
Printing Telegraph Company referred to in the letter

of July 28, 1900, from Crawford, as superintendent of appellant, to Solders, president of the Type Company contained a provision that it might be assigned to a company owned and controlled by Martin, Stewart and Crawford. It is evident from this and other facts in the record and the manner in which the business was conducted that the National Telegraph News Company was organized for the benefit of appellant and to act in conjunction with appellant company which was owned and controlled by Martin, Stewart and Crawford. Reasons which appeared entirely satisfactory to the managers of appellant dictated the policy of forming another company, the National Telegraph News Company, as a means or method of securing control of all these properties and operating them for the benefit of appellant and in the interest of appellant. The properties acquired under both leases were connected up with the lines of appellant directly and were used by appellant in its telegraph business from the date of the leases to a period long after the receiver was appointed; and all the properties and the facilities afforded by them were managed and conducted as one business entity and enterprise. The evidence is uncontradicted practically that the acquisition of the right to use the wire facilities of the Type Telegraph Company was indispensable to appellant in the condition of its property in 1900. It also shows that the control of the ticker business of the Type Telegraph Company was important to appellant. It is clear, we think, from the evidence that by acquiring the lease from the Type Telegraph Company, for this is the substance of the transaction and the intent of the parties to it, appellant merely adopted proper and convenient means to accomplish the objects and exercise the powers conferred on it by its charter, and it did not amount to the transaction of a separate unauthorized business. Central Lumber Co. v. Kelter, 201 Ill. 503, 507; Richelieu Hotel Co. v. International M. E. Co., 140 *id.* 248; Carmichael v. Lake St. E. Co., 184 *id.* 348; Winterfield v. Cream City Brewing Co.,

96 Wis. 239; Mercantile T. Co. v. Kiser & Co., 91 Ga. 636.

It is insisted, however, that the execution of the guaranty by Stewart and Crawford was wholly unauthorized; that the transaction was so far outside of the ordinary course of business that it did not fall within the implied powers of Stewart as vice-president and Crawford as secretary to bind appellant by the execution of such a guaranty, and no action was ever taken by the board of directors authorizing it.

If the questions before us in this record are to be viewed merely from the standpoint of the forms which the transactions took out of which they arise, and the nominal parties to the transactions, and are to be decided by the application of the technical rules of law to them as if they were presented separately in proceeding at law, certain results would necessarily follow. But this is a proceeding in equity and a court of equity will look to the substance of the transactions and the intention of the parties as evidenced by what was said and done by them, rather than to the mere form of the separate transactions, and thus obtain a true, equitable perspective of the transactions involved and apply to them equitable principles in administering or refusing relief.

The record shows that in the spring of 1900 the Midland Telegraph Company, the original complainant, was organized under the laws of Wisconsin, ostensibly to do a telegraph business. What it did, however, in connection with the matters in controversy now before us was to take over substantially all of the capital stock of appellant and issue bonds upon the stock as collateral security. In this way a certain amount of money was raised. Crawford, Stewart and Martin owned and controlled the Midland Telegraph Company, and through it the appellant company. The whole business and policy of appellant company was controlled by Martin, Stewart and Crawford during the period covered by the transactions in question.

These same parties organized the National Telegraph News Company and took from appellant an assignment of the lease from the Printing Telegraph News Company and assigned the lease and also the lease from the Type Telegraph Company to the National Telegraph News Company in payment of the capital stock of that company. They were therefore the persons about whom the transactions involved in this case center, for they were the owners and controllers of all the corporations involved in the transactions, except the Type Telegraph Company and the Printing Telegraph News Company. After the leases were made, the offices and business of the Type Telegraph Company and the Printing Telegraph News Company were moved into the same suite of offices with that of appellant, and from that time forward the properties and business of these three companies and the National Telegraph News Company were operated and conducted by the same persons. The officers of the latter named company were the same as those of appellant.

In view of these facts and of this situation, the case is not one where the officers have caused the corporation to guarantee a contract made with some of its directors for their individual benefit. Here the act of appellant in guaranteeing the lease was for the benefit of appellant, and appellant for a number of years acquiesced in the lease and guaranty, and received the benefits and advantages of the lease. and it cannot now be allowed in equity to raise the defense that its officers and owners exceeded their powers in making the guaranty of the lease. No showing is made that the contract was unfair or unreasonable, or a fraud upon the rights of appellant. On the contrary the guaranty and the lease are shown to be of great value to appellant. Cook on Corporations (5th ed.), sec. 684; Morawitz on Corporations (2nd ed.), sec. 632; Pneumatic Gas Co. v. Berry, 113 U. S. 322, 327. But aside from the question of estoppel, we think

that Martin, Stewart and Crawford were the agents of appellant in obtaining the lease, and that the contract or lease, although in form made with the individuals named and guaranteed by appellant, was actually the contract of appellant.

The record shows that no license to do business in this State was ever obtained by the Type Telegraph Company until February 6, 1905, which was several years after the lease in question was made, and one month after the original bill was filed. The cross-bill was filed several months subsequent to the compliance with the statute prohibiting foreign corporations from doing business in this State, until certain conditions are complied with. On this state of facts it is contended that the guaranty of the lease was null and void by force of the statute.

Section 67b of chapter 32, Hurd's Revised Statutes of 1903, provides that no foreign corporation organized for pecuniary profit shall be authorized or permitted to transact business in this State or to continue business therein, if already established, until it shall designate some person as its agent or representative in this State on whom service of process may be had if desired.

Section 67d of the same chapter provides for a fine for neglect or failure to comply with the provisions of the act; and in addition provides that such corporation cannot maintain any legal or equitable proceedings in the courts of this state upon any demand.

Section 67c of the same chapter provides in its concluding paragraph as follows: "And provided, further, that the provisions of this act shall not apply to railroad or telegraph companies which have heretofore built their line of railway into or through this State, nor to insurance, banking or loaning companies."

Under the rules of construction applicable to statutes of this character, this statute should be construed

liberally, and unless corporations of this character come within the plain provisions of the act, it should not be so construed as to nullify their contracts and deprive them of their legal remedies. By the express provision of section 67c above quoted the act does not apply to telegraph, insurance, banking or loaning companies. As we have seen the Type Telegraph Company is a telegraph company. It therefore comes within the proviso above quoted and the provisions of the statute do not apply to it.

What we have said upon the objections made to the lease of the Type Telegraph News Company apply to those made to the lease of the Printing Telegraph News Company and need not be repeated. The latter company is, in our opinion, a telegraph company and it was within the powers of appellant to acquire its cables, wires, appliances and business in the legitimate promotion of the purposes and business for which it was incorporated. If appellant leased of the Printing Telegraph News Company property suitable for telegraphic purposes and then used it for other purposes, or if appellant leased more of such property than was necessary for its purpose, the state alone can complain. Appellant, or those assigning cross-errors on this appeal, cannot complain. Brewer & Hoffman B. Co. v. Boddie, 181 Ill. 622; Alexander v. Tolleston Club, 110 id. 63; Rector v. Hartford Deposit Co., 190 id. 380.

The lease of the Printing Telegraph News Co. to appellant provided that appellant should have the right "of assigning this contract, on or before the first day of September, 1900, to a company now organized or to be organized, provided that the company to which said assignment is made shall be owned or controlled by Messrs. L. M. Martin, W. R. Stewart, Jr., and F. E. Crawford, and shall have the right to operate in Illinois."

This provision gave appellant the right to assign the lease, but it did not provide that the assignment

when made should operate as a release of appellant. An assignment of a lease with the assent of the lessor does not release the lessee, but both the lessee and the assignee are liable. Grommes v. St. Paul T. Co., 147 Ill. 635; Barnes v. Northern T. Co., 169 *id.* 112. And this is true, even though the lessor accepts rent from the assignee where there was no intention of the lessor to release the lessee and accept the assignee in his place. Grommes v. St. Paul T. Co., *supra*. It appears, hówever, that all receipts which were given for rent paid under the lease ran to appellant. No evidence in the record tending to show that the Printing Telegraph News Company agreed to release appellant is called to our attention, and we find no such evidence. On the contrary, the intention is manifested on the part of the Printing Telegraph News Company not to release appellant. We cannot concur in the contention that the assignment of the lease discharged appellant from liability.

The decree of the Circuit Court is affirmed.

*Affirmed.*