THE WISCONSIN TELEPHONE COMPANY VS. THE CITY OF OSH-
KOSH.

*December 4 — December 16, 1884.*

TELEPHONE COMPANIES: MUNICIPAL CORPORATIONS. *(1) Incorporation
and powers of telephone companies. (2, 3) Exaction of license
fees by cities.*

1. Under sec. 1771, R. S. (ch. 220, Laws of 1883), telephone companies,
though not specifically mentioned, may be incorporated with
powers like those given to telegraph companies by sec. 1778, R. S.
2. Telephone companies being required to pay to the state annually a
license fee for carrying on their business, and it being provided
that such fee shall be in lieu of all taxes for any purposes author-
ized by the laws of the state (ch. 345, Laws of 1883), a city can-
not, without legislative authority, exact an additional license fee
from such a company, for purposes of revenue only.
3. A city charter expressly stating what the common council may
license, by implication prohibits the exaction of license fees from
other things.

APPEAL from the Circuit Court for *Winnebago* County.
The case is thus stated by Mr. Justice CASSODAY:

"It appears from the complaint that on October 29, 1880,
one Athearn had, by permission, consent, and approval of
the defendant, used and operated a telephone line in the
city, and had erected poles in the streets and alleys thereof,
on which were placed the necessary wires to use in the busi-
ness, and that he continued to hold and operate the same
until March 21, 1881, when the plaintiff, having become
incorporated, became the owner thereof by purchase from
Athearn; that under ch. 345, Laws of 1883, the plaintiff
obtained a license from the state to operate its line and con-
duct its business throughout the state during the year 1883;
that prior to that act the plaintiff had established its line,
office, and business in Oshkosh, and had by its wires con-
nected its subscribers in that city with many other cities and
villages in the state; that on June 6, 1883, the 'defendant,

well knowing the premises, but with the design and intent to collect an unjust and illegal tax of the plaintiff,' passed an ordinance purporting to give to the plaintiff the right to erect or maintain its telephone line upon poles or posts in certain streets and public alleys of the city in such a manner as not to create obstruction to the free passage of people traveling thereon; and also to run lines of telephone wires from such poles or posts along, through, over, and across such streets and public alleys, so far as the right of the city was concerned: *provided,.* the plaintiff would first pay the city $300 for each and every year that the same should be so maintained; and that if it failed to so pay within ten days after the ordinance was published, or within ten days after May 1st, in any succeeding year, then the city should cause such poles and posts to be taken down and removed; that the plaintiff refused to comply with the ordinance until the defendant proceeded to cut down and remove such poles, when the plaintiff was compelled to, and did, under protest, July 3, 1883, comply with and pay the $300 so illegally exacted; that thereafter, and August 24, 1883, the plaintiff demanded the repayment of the amount so paid, which was refused, and this action was brought to recover the same.

"The answer was to the effect that the defendant admitted the incorporation and the organization of the plaintiff, but denied any knowledge or information sufficient to form a belief as to whether the plaintiff had a license from the state, and alleged that the ordinance allowing Athearn to erect and maintain the telephone line was made without power or authority, and was therefore unlawful, and that in any event it was repealed by the ordinance of June 6, 1883. The answer further admitted the enactment of the ordinance of June 6, 1883, the refusal to pay as required, the pulling down of the poles, and the cutting of the wires in consequence of such refusal. It alleged that the city had the exclusive control and management of such streets and alleys,

and the right to abate and remove all obstructions' there-from; that such poles were obstructions, and that such payment had been exacted for the right and privilege of so using and enjoying such streets and alleys for the purposes of the plaintiff's said business.

"The plaintiff demurred to the answer upon the ground that it did not state facts sufficient to constitute a defense, and from the order sustaining such demurrer the defendant appeals."

For the appellant there was a brief by *John W. Hume*, City Attorney, and *Gabe Bouck*, of counsel, and oral argument by *Mr. Hume*. They contended, *inter alia*, that the power to regulate implies the power to license, and the power to license carries with it the power to charge for the privilege conferred. *Milhau v. Sharp*, 15 Barb. 198; *N. Y. & H. R. R. Co. v. Mayor*, 1 Hilt. 562; *First Municipality v. Pease*, 2 La. Ann. 538; *St. Louis v. Green*, 70 Mo. 562; *Brooklyn v. Nodine*, 26 Hun, 512. Ch. 345, Laws of 1883, has nothing to do with the question.

For the respondent there was a brief by *Finches, Lynde & Miller*, and oral argument by *Mr. W. P. Lynde*. They argued, among other things, that the ordinance was not a police regulation, but purely a fiscal measure to produce revenue, and as such was void. Burroughs on Taxation, 393, sec. 132; *Mayor v. Beasly*, 1 Humph. 232; *Freeholders of Essex v. Barber*, 7 N. J. Law, 67; *Dunham v. Trustees of Rochester*, 5 Cow. 462; *Kip v. Mayor of Patterson*, 26 N. J. Law, 298; *Mays v. Cincinnati*, 1 Ohio St. 268; *State v. Mayor of Hoboken*, 33 N. J. Law, 280. The object of a license is to confer a right that does not exist without a license; but here the plaintiff had all the rights conferred by the ordinance by virtue of the license from the state. If the city is entitled to charge any fee, it is only such a fee as will legitimately assist in the regulation of the business; if more than that, it is a tax, and as such is unauthorized.

The Wisconsin Telephone Co. vs. The City of Oshkosh.

*Lucas v. State Lottery Comm'rs*, 11 Gill & J. 506; *Mays v. Cincinnati*, 1 Ohio St. 268; *Cincinnati v. Bryson*, 15 Ohio, 625; *Freeholders v. Barber*, 7 N. J. Law, 64; *Kip v. Mayor of Patterson*, 26 id. 298; *Bennett v. Birmingham*, 31 Pa. St. 15; *Comm. v. Stodder*, 2 Cush. 562; *Mayor v. Yuille*, 3 Ala. 137; *Mayor v. Second Ave. R. R. Co.* 32 N. Y. 261; *St. Louis v. Boatmen's I. & T. Co.* 47 Mo. 153. In *Hannibal v. Guyott*, 18 Mo. 521, it was held that when a county license was already in force, another city license could not be enforced. See, also, *Robinson v. Mayor*, 1 Humph. 161–2.

CASSODAY, J. The telephone is a new invention; so recent, that even our statutes, as revised in 1878, fail to mention it. By what authority is it at large in Oshkosh? May that municipality legally exact a license fee of $300 a year for the privilege of its remaining? This is the question that confronts us. The corporate existence of the plaintiff, not having been specifically denied, stands as admitted. Sec. 4199, R. S.; *Crane Bros. Manuf'g Co. v. Morse*, 49 Wis. 370. Of course, the corporation was necessarily formed, and the charter necessarily obtained, under ch. 86, R. S. As indicated, there is no express mention of any telephone therein. Sec. 1771 of that chapter does expressly authorize the formation of corporations for the "purpose" of "building and operating telegraph lines, or conducting the business of telegraphing in any way; . . . or for any lawful business or purpose whatever, except" certain classes of business specifically mentioned. Precisely the same language is preserved in the amendment to that section. Ch. 220, Laws of 1883. Such corporation, "to build and operate telegraph lines, or conduct the business of telegraphing," is especially authorized to "conduct and maintain such lines, with all necessary appurtenances, from point to point upon or along or across any public road, highway, or bridge, or any stream or body of water, or upon the land of any owner *consenting*

thereto, and from time to time extend the same at pleasure; and may connect and operate its lines with the lines of any person, company, or corporation without this state; and charge reasonable tolls for the transmission and delivery of messages. But no such telegraph line, or any appurtenance thereto, shall at any time obstruct or incommode the public use of any road, highway, bridge, stream, or body of water." Sec. 1778, R. S. In addition to the special powers so given, every such corporation, when so organized, is made a body corporate by the name designated in its articles, and has the powers of a corporation, conferred by the statutes, necessary or proper to conduct the business, or accomplish the purposes, prescribed by its articles, but no other or greater; and may take, manage, hold, convey, lease, or otherwise dispose of, at pleasure, such real and personal property, of whatever kind, as shall be necessary to its business or purposes, or to the protection or benefit of its property held or used for the corporate business or purposes. Sec. 1775, R. S.

It is urged that the powers thus expressly given to form and organize corporations for the purpose of building and operating telegraph lines, or conducting the business of telegraphing in any way, includes the power of forming and organizing corporations for the purpose of building and operating telephone lines, or conducting the business of telephoning in any way. Of course there is a distinction between the two classes of business, but in almost every respect they are very similar, if not identical. Each of them must erect its poles or posts, and upon the tops of them attach its lines of wire from point to point. Each must almost necessarily enter upon, along, or across public roads, highways, streams, bodies of water, and upon the lands of individuals, for the purposes mentioned. In these respects they seem to be identical. One may require more lines of wire than the other, but we are not aware of any other dis-

tinction outside of their offices or places of operation distinguishable to the naked eye. It is these indistinguishable features alone that the city of Oshkosh had to deal with. Possibly there may be a marked distinction in the varying intensity of the electric currents in the one case and in the other at the point of transmission or receiving, or even at points along the line; but such difference, if it exists, hardly concerns the question here presented.

As for the difference in the mode of communication by means of a telegraphic and telephonic apparatus, see *Attorney General v. Edison Telephone Co. of London*, L. R. 6 Q. B. Div. 244. In that case Mr. STEPHEN, one of the judges of the Exchequer division of the High Court of Justice, who, unlike most American judges, seems to have sufficient time not only to satisfy his own curiosity, but the curiosity of all the curious, has given a very lengthy and definitive discussion of that subject. In that case the court conclude that Edison's telephone was a telegraph, within the meaning of the telegraph acts, although the telephone was not invented nor contemplated when those acts were passed. It is there said, in effect, that the mere " fact, if it is a fact, that sound itself is transmitted by the telephone, establishes " no " material distinction between telephonic and telegraphic communication, as the transmission, if it takes place, is performed by a wire acted on by electricity." It is there further said that, "of course, no one supposes that the legislature intended to refer specifically to telephones many years before they were invented, but it is highly probable that they would, and it seems to us clear that they actually did, use language embracing future discoveries as to the use of electricity for the purpose of conveying intelligence." It is upon this theory of progressive construction that the powers conferred upon Congress to regulate commerce, and to establish post-offices and post-roads, have been held not confined to the instrumentalities of commerce, or of the postal serv-

ice, known¹ when the constitution was adopted, but keep pace with the progress and developments of the country, and adapt themselves to the new discoveries and inventions which have been brought into requisition since the constitution was adopted, and hence include carriage by steam-boats and railways, and the transmission of communications by telegraph. *Pensacola Tel. Co. v. W. U. Tel. Co.* 96 U. S. 1. If there remains any doubt as to the power given to charter a telegraph company being sufficiently broad to include a telephone company, then it must be dispelled by the general clause above quoted from sec. 1771, to wit, "for any lawful business or purpose whatever, except," etc.; for by a well-settled rule of construction these general words extend to things of a kindred nature to those specifically authorized by the section, and hence to whatever is of a kindred nature to telegraphing, which most certainly includes telephoning. *Noscitur a sociis.* We must conclude that under the statute it was competent to form, organize, and incorporate a telephone company possessing like powers with those given to telegraph companies.

It appears in the record before us that the poles and posts of the plaintiff in the streets and public alleys of the city, and the wires upon them, had been put there and operated to June, 1883, by the permission, consent, and approval of the defendant, under what was known as the Athearn ordinance. The common council had the power to pass that ordinance "for the benefit of the trade and commerce" of the city. Sec. 4, subch. 6, ch. 123, Laws of 1877; sec. 3, subch. 6, ch. 183, Laws of 1883. Of course, the city had no power to authorize any permanent obstruction or interference with the free passage or travel upon the streets and public alleys. *Hume v. Mayor*, 74 N. Y. 264; *Cohen v. Mayor*, 33 Hun, 404; *S. C.* 30 Alb. L. J. 443. Such obstruction or interference was expressly prohibited by the statute quoted. That ordinance did not attempt to give such au-

thority, but the contrary. All the poles and posts seem to have been set, and the wires suspended, in accordance with the permission given in the ordinance. The plaintiff succeeded to the property and rights owned and enjoyed by Athearn under that ordinance. Thus it appears that the plaintiff occupied certain portions of the streets and public alleys of the city to June, 1883, not only by express grant of the legislature, but by the express permission of the city authorities. Assuming that the city might otherwise exact an annual license from the plaintiff for the privilege of operating its lines in the city, then it might, for the purposes of this case, be conceded that it was not precluded from so doing merely by reason of the poles and posts being set, and the wires suspended, in pursuance of the Athearn ordinance. *Memphis Gas Light Co. v. Taxing District,* 109 U. S. 398; *Butchers' Union, etc., Co. v. Crescent City, etc., Co.* 111 U. S. 746. But, as we view this case, that question does not arise.

Nor does the question arise whether the city could legally authorize such an occupation of the streets and public alleys against the will or consent of the abutting owners, for the simple reason that the city did not, by that ordinance, undertake to give such authority. It only undertook to authorize "so far as the rights of said city were concerned." Whether such occupancy was an additional burden upon the highway, for which abutting owners might have exacted compensation, is a question upon which the courts are divided. The supreme court of Illinois has held that in the case of telegraph companies it was. *Board of Trade Tel. Co. v. Barnett,* 107 Ill. 507; *S. C.* 29 Alb. L. J. 92. In Massachusetts the contrary doctrine has been held by a divided court. *Pierce v. Drew,* 136 Mass. 75. As the question is not here squarely involved we express no opinion upon it; nor as to whether the statute has given to telephone or telegraph companies the right of eminent domain.

By ch. 345, Laws of 1883, the plaintiff was required to pay to the state annually a license fee of one per centum of the gross receipts of its business within the state, and thereby it secured a license to carry on its business in the state. This it did. The act also provides that such license fee shall be in lieu of all taxes for any purposes authorized by the laws of the state, except upon certain specific property. Of course the city could not levy a tax in violation of that act. But a mere license is not a tax. Nor could the city exact an additional license without legislative authority so to do. *Moran v. New Orleans,* 112 U. S. 69. Undoubtedly the common council had authority, and it was its duty, by ordinances, resolutions, or by-laws, to control and regulate the streets, alleys, and public grounds of the city, and to remove and abate whatever might be fairly regarded as an obstruction or encroachment thereon. Subd. 30, sec. 3, subch. 6, ch. 183, Laws of 1883. The same section declares that the common council shall have like authority " to regulate, control, and prohibit the location, laying, use, and management of telegraph, telephone, and electric light and power wires and poles." Subd. 66. But we do not think this was designed as giving to the municipality absolute authority to remove such poles and wires entirely from the city, nor to exclude such companies altogether from carrying on or operating their business within the corporate limits of the city, but simply to regulate the same, and to prohibit such location in improper places. Otherwise the municipalities of the state would have the power to nullify what the legislature had expressly authorized.

Undoubtedly the common council, under the charter, had the right to regulate, in order to guard and secure the public safety and convenience, but their regulations, to be valid, should have been reasonable and fair, and not have gone to the extent of confiscation, nor of wholly excluding the plaintiff from the city. *American U. Tel. Co. v. Harrison,*

31 N. J. Eq. 627. But express power to exclude merely would not be a grant of power to license. *Leonard v. Canton*, 35 Miss. 189. The pecuniary exaction here was merely for doing what the legislature had expressly authorized to be done. The mere exaction of money for revenue only for such authorized act was not among the police powers of the city. *Mayor v. Second Ave. R. R. Co.* 32 N. Y. 261. Besides, neither telephones nor telegraphs are named among the several things that the common council are expressly authorized "to license." Subd. 2, sec. 3, subch. 6, ch. 183, Laws of 1883. The charter having thus expressly stated what the common council might license, without naming telegraphs or telephones, has, by necessary implication, prohibited the exaction of such license of either of those companies. *Expressio unius est exclusio alterius.* It follows that the ordinance of June 6, 1883, exacting the $300 in question, was unauthorized by the charter, and in conflict with the statute, and therefore void.

*By the Court.*— The order of the circuit court is affirmed.