CITY OF LA CROSSE, Appellant, vs. LA CROSSE GAS & ELECTRIC COMPANY, Respondent.

*February 1—March 14, 1911.*

*Public utilities: Municipal corporations: Granting franchises: Terms and conditions: Excise tax: Public utility law: Surrender of old franchises: Indeterminate permits: Uniformity: What contracts and conditions abrogated.*

1. A public franchise, burdened with a public revenue feature, is not grantable by a state agency in the absence of express or unmistakable legislative authority to impose such a burden.

2. Mere authority to a municipality, as in sec. 1780b, Stats. (1898), for the holder of a state franchise to exercise it within the cor-

La Crosse v. La Crosse Gas & Electric Co. 145 Wis. 408.

porate limits of a city by consent of and in the manner agreed upon therewith, does not include power to such city to exact, as a condition of such exercise, payment of an excise tax in addition to all other taxes.

3. Sec. 1780b expresses no more than that the municipality may impose reasonable burdens.

4. Municipalities do not possess power to license occupations and exact compensation for the purpose of obtaining public revenue, in the absence of unmistakable granted authority to that effect.

5. The mere power to exclude a corporation from exercising a franchise in a municipality, does not include power to allow such exercise on condition of submitting to a special taxation burden.

6. Laws should be strictly construed to avoid reading therefrom a special tax burden feature.

7. A law authorizing a municipality to grant to a corporation the privilege to exercise its public utility franchise therein "upon such terms and subject to such rules and regulations and the payment of such license fees as the common council may prescribe" authorizes such use to be conditioned upon prescribed rates for service.

8. Such feature as that mentioned engrafted upon a corporate railway franchise by the state, or an authorized state agency, inheres therein and is subject to the reserved power to alter or amend.

9. Power to a municipal or *quasi*-public corporation to make contracts affecting public interests, acting in the mere business capacity to deal with proprietary matters, is not to be inferred by doubtful construction.

10. The condition of a corporate public utility franchise which inheres in the privilege as distinguished from mere contracts which the corporation may make, is subject to the provisions of the public utility law that all charges shall be just and reasonable.

11. A corporate franchise is one thing, a mere privilege not corporate, which may be granted without condition and become mere property—be sold and pass from one to another as other property may—is a far different thing.

12. The purpose of the public utility law of 1907 (Laws of 1907, ch. 499), was to ultimately secure uniformity in public utility franchises,—past as well as future grants,—to the end that patrons might obtain service on a plane of equality and at the lowest price practicable—producers and consumers being com-

pelled to deal justly with each other and both deal. justly with the public as a whole.

13. The indeterminate permit of the public utility law, is a public privilege emanating direct from the state to own, operate, manage, or control any plant or equipment, or any part of a plant or equipment within the state for the production, transmission, delivery, or furnishing of heat, light, water, power, either directly or indirectly to or for the public, and is perpetual and exclusive, subject to the conditions of the public utility law. *State ex rel. Kenosha G. & E. Co. v. Kenosha E. R. Co., ante,* p. 337.

14. The scope of the privilege which springs into existence by operation of law by surrender of a franchise under the act of 1907 is the same as that of the one surrendered, divorced, however, from all the old conditions, and conditioned, only, upon the provisions of such act.

15. The idea of the act of 1907 was that old franchises, with their peculiar burdens, should be treated as entireties, and that the surrender, in form, of the principal thing should operate as an extinguishment of all incidents inhering therein, and that the thing taken back should be an exact equivalent as to the privilege feature but as to incidents and duration should be referable to the public utility law.

16. The surrender of a public utility franchise operates as a waiver by the corporation of all executory features of existing contracts regarding service charges regulated by the public utility law.

17. The feature of the public utility law rendering nonenforceable existing contracts relating to any charge or service regulated thereby, in case of conversion of an old into a new franchise by a surrender of the former, by necessary implication, renders nonenforceable obligations of the corporation incurred as a condition of the old franchise and substitutes therefor the obligations and conditions of such law.

18. The foregoing covers such special conditions of an old franchise as that of payment to the municipality of compensation as a consideration for the privilege, but not mere business contracts between the corporation and individuals as in case of *Superior v. Douglas Co. Tel. Co.* 141 Wis. 363.

19. To carry out the legislative idea of our system securing justice between municipalities, public utility corporations, and their patrons, future original franchises were treated in one group, franchises given for old grants in another,—the new creations

in either case to be indeterminate permits with uniform char-
acteristics,—with municipal power to deal with the owner in
any case or with the owner of an old franchise, referable solely
to the public utility law.

[Syllabus by MARSHALL, J.]

BARNES, J., dissents.

APPEAL from an order of the circuit court for La Crosse
county: E. C. HIGBEE, Circuit Judge. *Affirmed.*

Action for an accounting and to recover a debt claimed to
be due under defendant's electric light franchise.

These are the facts stated in the complaint material for
consideration:

Defendant is and was during all the times which concern
this case, a public utility corporation in the city of *La Crosse,*
Wisconsin, engaged in the generation, distribution, and sale
of electric current therein for public and private purposes,
using the streets and public places to that end. The terms of
the franchise under which defendant used such streets and
public places required it to pay into the treasury of the city
two per cent. of its gross earnings in addition to such other
taxes as are provided by law. November 8, 1909, the fran-
chise required defendant to give plaintiff a statement show-
ing the amount of its gross earnings for the previous year.
It neglected and refused to do so or to afford plaintiff oppor-
tunity, by examination of its books, to determine such
amount. Wherefore plaintiff is unable to state the sum or
arrive thereat without an accounting.

There was an appropriate prayer.

Defendant answered, among other things, that pursuant to
ch. 499, Laws of 1907 (sec. 1797*m*—77, Stats.), it duly sur-
rendered the franchise referred to in the complaint and re-
ceived in lieu thereof an indeterminate permit as provided in
said section, and that, since July 22, 1908, it has conducted
its business thereunder instead of the old franchise, which
period includes the time covered by plaintiff's demand.

In addition to the foregoing defendant counterclaimed that November 8, 1908, it gave plaintiff a statement of its gross earnings for the previous year, but protested against being charged two per cent. thereof, except to the aforesaid date of surrender, but plaintiff refused to accept less than the full year's tax, wherefore defendant, December 23, 1908, paid the same, protesting, however, that it included an overpayment to the extent of $731.91.

Plaintiff demurred to the defense for insufficiency and likewise to the counterclaim. Both demurrers were overruled. Plaintiff appealed.

· *John F. Doherty,* for the appellant.

For the respondent there was a brief by *Woodward & Lees,* and oral argument by *G. M. Woodward.*

Marshall, J.    Secs. 940*b* to 940*j*, Stats. (1898), relating to the sale of franchises by cities and villages has no bearing here other than, perhaps, as indicating legislative conception of the clearness required in conferring power on a municipality to regulate occupations for the purpose of public revenue.    In that respect the difference between such sections and the one important to this case is quite striking as we shall see.    While that circumstance may have been given rather too great significance in deciding the case below, as counsel for appellant suggests, the reasoning of the circuit judge by no means is illogical.    The learned judge did not refer to such sections as indicating that the appellant did not possess competency to condition exercise of respondent's franchise upon its paying a license tax in any other sense than that no such power was inferable from the mere existence of the municipal corporation with ordinary powers, and that no such authority was within the letter of the legislative language upon which appellant relied for its competency to act as a legislative agency.    The suggestion of counsel that such sections rather tend to show the contrary of the circuit

judge's conclusion, overlooks the fact that the question is not whether a municipality might have the competency claimed, but whether appellant was afforded such competency by the written law depended on.

Unlike grants made under sec. 940b and its associate sections, where they are made wholly by the state agency method and with the plainest of authority as to dealing with the matter on a public revenue basis, the franchise in this case came directly from the state under sec. 1780b of the statutes. There was no municipal interference in the matter permissible, except such as was authorized by the words, "Any corporation . . . may, with the consent of and in the manner agreed upon with the authorities of any city or village, use any street," etc.   It is not perceived how power to attach to a state franchise a public revenue condition can be gathered from the quoted language under the rules governing the subject.   Under such rules and the precedents, such language contemplates mere police regulations.   They do not extend to licenses with revenue incidents in the nature of excise taxes, or otherwise.   *Wis. Tel. Co. v. Oshkosh,* 62 Wis. 32, 21 N. W. 828; *Marshfield v. Wis. Tel. Co.* 102 Wis. 604, 78 N. W. 735; *State ex rel. Wis. Tel. Co. v. Sheboygan,* 111 Wis. 23, 86 N. W. 657; *State ex rel. Wis. Tel. Co. v. Sheboygan,* 114 Wis. 505, 90 N. W. 441; *Wis. Tel. Co. v. Milwaukee,* 126 Wis. 1, 104 N. W. 1009; *State ex rel. Smythe v. Milwaukee Ind. Tel. Co.* 133 Wis. 588, 114 N. W. 108, 315.

It is said such authorities do not apply since they deal only with sec. 1778, giving, as construed, telephone companies absolute right to use streets under police regulations, while sec. 1780b gives such right conditioned upon consent of the municipality being given and an agreement being made as to the manner of the use, the one conferring power of exclusion and the other not.   True, but the fact remains, as we construe sec. 1780b that the consent and agreement mentioned appertain merely to police regulations.

The power to license and exact fees, especially in the nature of a tax or compensation for use of a governmental privilege, cannot be exercised by a municipality unless expressly or at least, very plainly conferred. So the principles of the cases referred to apply, since, at the best for appellant, nothing other than mere police regulations are within the meaning of the language in question unless extended to the point of very doubtful construction under the circumstances.

In the first case cited it was held that express power to exclude does not give power to license and exact payments for revenue purposes. Here there was power to exclude or not at pleasure and to agree as to the manner of enjoying the consent in case of its being given. That came far short of conferring power to exact, as a condition of consent, payment of a license fee or tax of a contractual nature. Such a charge does not fall under the power, even to license, strictly so called, but rather the broader power to tax. *State ex rel. Att'y Gen. v. Winnebago Lake & F. R. P. R. Co.* 11 Wis. 35; *State v. C. & N. W. R. Co.* 132 Wis. 345, 112 N. W. 515; 2 Smith, Mun. Corp. § 1455.

Taxing laws are to be strictly construed, and that is peculiarly so as to such laws as the one under consideration. Probably such rule should be applied quite to the point of requiring words of unmistakable meaning to be used in conferring the power; words expressing the intention without going beyond the letter or necessary inference, where the effect would otherwise be not only to impose a tax of an excise character but impose it in addition to all other taxes of an ordinary character, as in this case. 2 Smith, Mun. Corp. § 1456 and cases cited.

Neither in the foregoing nor in anything which may hereafter be said in this opinion, do we overlook what was held in *Manitowoc v. Manitowoc & N. T. Co., ante,* p. 13, 129 N. W. 925. The questions there determined are:

(a) Sec. 1863, Stats. (1898), as amended by ch. 425,

Laws of 1901, authorizing use of the streets of any city for passage of interurban railway cars "with the consent of the common council" thereof "upon such terms and subject to such rules and regulations and the payment of such license fees as the common council may prescribe,"—empowers the municipality, as a state agency, to engraft upon the interurban railway franchise a feature limiting the rate of fare between the city and a point without reached by the railway service, to be submitted to as a condition of using the city streets for interurban railway purposes;

(b) A feature so engrafted upon a corporate railway franchise and accepted as part of the grant, inheres therein and is subject to the reserved power of the state under the constitution to alter or amend;

(c) Power to a municipal or *quasi*-public corporation to make contracts affecting public interests, acting in its business capacity merely and dealing with proprietary rights, is not to be inferred from the written law by doubtful construction;

(d) The power conferred upon cities respecting interurban railways under ch. 425, Laws of 1901, is that of acting as a state agency in moulding the character of corporate franchises of a particular kind and so subject to the reserved power to alter or amend;

(e) A franchise of the foregoing character, so far as it relates to the subject covered by ch. 362, Laws of 1905, while not superseded thereby is controlled by the language thereof requiring all charges for service dealt with by the act "to be reasonable and just" and prohibiting "every unjust and unreasonable charge for such service" and declaring every such charge "unlawful,"—to the extent that a condition of such a franchise limiting the rate of service from the grantee to a neighboring city is subject to the determination of the railroad commission, under the act of 1905, as to its reasonableness.

In reaching those conclusions numerous citations of authorities were given with quotations therefrom. In the aggregate they cover a wide diversity of statutory conditions; some of a police nature, some appertaining to a much broader power, and some, perhaps, of a police and revenue character as well. Perhaps it may appear that some extreme views are expressed in some of the authorities, which upon consideration we might not wish incorporated into our system. Certainly not in so far as they run counter, if at all, to the decisions of this court that power to a municipality to impose burdens on occupations other than such as appertain to police powers, or engraft such burdens upon franchises granted by municipalities acting as state agencies, must be found clearly expressed in the written law.

The citations and authorities referred to mirror the general trend of decisions and logic in support thereof respecting interferences by municipalities with public utility corporations under a variety of conditions, somewhat similar to the one then in hand, without committing this court to all such decisions or such logic.

In the *Manitowoc Case* the power challenged was found very satisfactorily expressed in the statutes. The words "upon such terms," in connection with the words "subject to such rules and regulations" and the additional words "and the payment of such license fees as the common council or board may prescribe," were thought, by necessary inference if not in the letter, to confer power of a broad character,— clearly beyond mere police authority. The first group of words, standing alone, might be held referable to police authority from one viewpoint, but from another much more clearly referable to a broader power, or perhaps to both fields of authority. But the second group refers distinctively to police authority, rather negativing the idea that the first group was used in that field. For the same reason, as well as by the letter, it would seem that the last group refers quite

plainly to other than police power.   There are further reasons which might be referred to, in the whole, persuading the court to the conclusion that, in the use of the words "on such terms" under the circumstances, restrictions on rates for service between the city and points beyond might well have been one of the very things the legislature had in contemplation.   No such plain language, or any language in fact, conferring other than police power is found in sec. 1780$b$ of the statutes without extending the meaning thereof beyond what it seems was the legislative purpose.

The claim that it was beyond legislative power to supersede a contractual arrangement of the nature of the one in question, because of constitutional restrictions, needs but a brief notice.

The revenue element of the old franchise, as before indicated, was inherent in it and so inseparably connected with the privilege emanating from the state under sec. 1780$b$ of the statutes.   It was added by the municipality, acting as a state agency.   The entirety was a state grant and so under legislative control like any other corporate state franchise. If in that situation it could have any contractual features, protected from impairment by constitutional limitations, the only parties thereto were the state and the respondent.   They mutually agreed to abrogate the franchise and, necessarily, as we shall see, the incidents attached by the state agency were abrogated likewise.   Such mere incidents could not well inferably survive the primary thing.

Whether mere contractual features, as between the state or any instrumentality used by it in conferring special privilege, and its grantee, inhering in the privilege itself, the franchise not being corporate, are within the reserved power to alter, amend, or repeal under sec. 1, art. XI, of the constitution, need not be discussed for the reason stated.   What the plaintiff did, if anything of a contractual nature, since it appertained to the franchise itself; the state did.   What the two

real parties to the transaction mutually did, obviously, they could mutually undo.

Though we thus leave a subject treated in the briefs of counsel, with passing notice, it is not to be taken as doubting the state of the law on the question. One needs, in respect to it, to distinguish between corporate franchises; in the sense of the right to corporate existence, and corporate franchises, as the term is often, not very accurately used; in the sense of, a privilege owned by a corporation in its proprietary capacity; a thing granted which when accepted is property,— may be acquired or parted with as any other property might, barring special legislative restrictions. *State ex rel. Att'y Gen. v. Portage City W. Co.* 107 Wis. 441, 83 N. W. 697; *Linden L. Co. v. Milwaukee E. R. & L. Co.* 107 Wis. 493, 514, 83 N. W. 851; *In re Southern Wis. P. Co.* 140 Wis. 245, 122 N. W. 801. The distinction has not always been appreciated as witness *State ex rel. Att'y Gen. v. Madison St. R. Co.* 72 Wis. 612, 40 N. W. 487; *State ex rel. Cream City R. Co. v. Hilbert,* 72 Wis. 184, 39 N. W. 326, and remarks with reference thereto in cases cited above and comparison therewith of *Ashland v. Wheeler,* 88 Wis. 607, 60 N. W. 818, and the language of and precise subject dealt with in sec. 1, art. XI, of the constitution.

Counsel cite *Superior v. Douglas Co. Tel. Co.* 141 Wis. 363, 122 N. W. 1023, respecting the foregoing matter; but, if it were not for the mutuality in the transaction in question, that adjudication would not have any bearing on the present case. There the contract was of the same nature as an ordinary agreement *inter partes.* It did not inhere in a franchise, corporate or otherwise. Moreover, it was of the species of private contracts expressly exempted from disturbance by sec. 1797m—91, Stats. (Laws of 1907, ch. 499), of the public utility law.

Counsel for appellant, in respect to the subject last dis-

cussed, seems to have failed to appreciate the distinction, clearly marked out by the circuit judge in harmony with the decisions of this court, between the nature and scope of state agency authority in granting public franchises and the granted business capacity of a municipality or other corporation to make contracts as a private person might, within the scope of the municipal power to contract. The distinction is too well understood to warrant enlarging upon it at this time.

If the propositions heretofore discussed were efficiently answerable in favor of appellant there would still remain a question striking at the very foundation of appellant's claim, in that it involves whether the old franchise with its incidents did not cease to exist before commencement of the period for which such claim is made. More labor seems to have been put on this branch of the case by respondent's counsel than any other. It is considered the presentation, under the circumstances, merits such careful consideration as if the matter involved were necessarily vital to the appeal.

This is the question at this point: Is the indeterminate permit, respondent accepted in exchange for its privilege referable to sec. 1780b of the statutes, conditioned by appellant as aforesaid,—burdened like the former privilege with the element requiring payment to the municipality of two per cent. of gross earnings "in addition to such other taxes as are provided by law?"

It is not likely the legislature supposed the law authorizing such exchanges of privileges as occurred would, or could, be regarded ambiguous respecting the scope either of the thing surrendered or that given back as an equivalent therefor.

The public utility law has been on the statute books so long that, probably, many franchises like the one in question have been given back to the state for so-called indeterminate per-

mits; there being mutuality of thought as to the status of such permits as regards the complications and uncertainties of the previous situation.

The confusion created during the years preceding the public utility law of 1907 by granting franchises in several different ways,—some directly by the state, some by cities as state agencies, some by the state in the main but with power to the various municipalities as state agencies to add supplementary features, fitting particular situations, some by the state without regard to local police regulations, and some likewise having such regard, either expressly or by necessary implication, some having contractual features creating doubt in regard to their constitutional status, and some having such features but without doubtful character, many of such matters being, in the ultimate, more or less detrimental to consumers, whether public or private, and proprietors as well,— in the whole, created a perplexing situation in respect to harmonious administration. The legislature sought to deal efficiently with this mixed situation, the growth of years, by taking over existing franchises with the consent of owners, compensating them for co-operating to that end by conferring in each case of surrender a new franchise to do the things privileged under the old one with conditions referable only to the law itself, and so providing that subsequent original franchises conferred in whole or in part through state agencies would be likewise referable. The traffic thus sanctioned and invited as to existing franchises has been considerable and, as said before, with definite mutual ideas as to the status resulting from the exchange. The property interests involved have doubtless been very great, the number of persons directly and indirectly interested large, and the transactions numerous as well. Obviously any construction of the law running counter to the general view entertained in such transactions should be avoided if practicable.

If we concede, for the case, that, in a reasonable view, the

public utility law is ambiguous, looking only at its words, we cannot well so say in the light of the situation the legislature dealt with, as indicated, and the new condition which was evidently desired. It is evident the aim was to displace existing public utility franchises of the nature of those mentioned in the act, so far as that could justly be accomplished, by new direct grants from the state of a uniform character, free from the peculiarities of old franchises, prejudicial to the dominant end in view; the best service practicable at reasonable cost to consumers in all cases and as near a uniform rate for service as varying circumstances and conditions would permit; a condition as near the ideal probably as could be attained.

It is useless to extend this opinion further for the purpose of picturing the situation dealt with by the legislature. The magnitude of the task was great. Few, if any, greater have been dealt with in our legislative history. The result stands significant as a monument to legislative wisdom. That such a complicated situation has been met by written law in such a way as to avoid successful attack up to this time on the validity of the law or any part of it, and avoid attack at all either upon the law or its administration, except in a very few instances, and secure optional submission by many owners of old franchises to a displacement of their privileges,— is quite a marvel; reflecting credit upon the lawmaking power and the body charged with the onerous duty of administering the statute, and challenging judicial attention to the importance of not, by construction, reading out of the enactment any meaning not clearly found there,—even to avoid a seemingly unlooked for disturbing consequence in a particular instance now and then,—which would tend to defeat the object of the law. The words of the enactment, dealing as it does with vast private and public interests, should, if practicable, be given a meaning so definite and comprehensive as to prevent any attempt to restrict it or extend it, so as to con-

tinue or renew or promote the detrimental consequences it was aimed to abolish and prevent.

In view of the foregoing let us turn to these words in sec. 1797*m*—77 (Laws of 1907, ch. 499) of the public utility law:

"Any public utility, being at the time a corporation duly organized under the laws of the state of Wisconsin, operating under an existing license, permit or franchise shall, upon filing at any time prior to the expiration of such license, permit or franchise and prior to July 1, 1908, with the clerk of the municipality which granted such franchise and with the commission, a written declaration legally executed that it surrenders such license, permit or franchise, receive by operation of law in lieu thereof, an indeterminate permit as provided in this act; and such public utility shall hold such permit under all the terms, conditions and limitations of this act. The filing of such declaration shall be deemed a waiver by such public utility of the right to insist upon the fulfilment of any contract theretofore entered into relating to any rate, charge or service regulated by this act."

Does not that language tell, without judicial aid, its own plain story, contemplating as to old franchises, in their entireties, a complete severance of all relations between sovereign authority,—whether exercised directly or through municipal agencies,—and the owners of the franchises, by an optional exchange of old ones for new ones, equivalent as to the privilege element, denominated indeterminate permits. There is no suggestion in the statutes of coercion, no hint of a purpose to take away from franchise owners anything other than by their consent; exchanging in each case a privilege with new incidents for an old one with its incidents; a complete change from an existing to a new condition.

The idea that in case of an exchange under the statute any incident of the former privilege inherent in and forming a part of it in the nature of mutual obligations between the

parties by reason of contractual features or otherwise,—except as to mere police regulations, not of course inconsistent with the act, surviving the change,—was not left readable out of the legislative scheme by judicial construction. *Ex industria* the legislature said, "the filing of such declaration shall be deemed a waiver by such public utility of the right to insist upon fulfilment of any contract theretofore entered into relating to any charge or service regulated by this act." All such matters were henceforth to be referable to the public utility law under the supervision of the state commission. Such statute was made unmistakably exclusive as to everything affecting the service, its character, and charges therefor to consumers, whether public or private. The extinguishment of the obligatory features of the old franchise as to one side by necessary inference operated to extinguish such features as to the other. Such must have been the legislative purpose.

The old franchise in question, like such franchises in general, contained many provisions relating to rates, charges, and service, and in close significant connection therewith and having, doubtless, a material bearing thereon, the obligation to pay the municipality the stipulated two per cent. on gross earnings. The tax, so called, could not come otherwise than from consumers and, therefore, to that extent enhance the cost of service to them. That burden had in the old grant, necessarily, compensatory features affecting rates. In the very nature of things the different features were not justly separable as they are not in case of franchises in general. So they were dealt with by the legislature as entireties, and the declaration as to the effect of the surrender of an old franchise was doubtless made to render that feature of the exchange from the old to the new condition unmistakable. Other provisions were added to the law in harmony therewith as we shall see.

The ultimate end aimed at is clearly indicated in sec. 1797m—3 in these words:

"Every public utility is required to furnish reasonably adequate service and facilities. The charge made by any public utility for any heat, light, water or power produced, transmitted, delivered or furnished, . . . shall be reasonable and just, and every unjust or unreasonable charge for such service is prohibited and declared unlawful."

The scope of the new species of franchises, whether created by automatic operation of sec. 1797m—77, or otherwise by direct or indirect state grant, or both, was clearly defined by sec. 1797m—1, subd. 5, in this language:

"The term 'indeterminate permit' . . . shall mean . . . power, right or privilege to own, operate, manage or control any plant or equipment or any part of a plant or equipment within this state for the production, transmission, delivery or furnishing of heat, light, water or power, either directly or indirectly, to or for the public."

The means for bringing all existing franchises of the nature referred to under the uniform system was clearly prescribed in sec. 1797m—77, as before indicated, and the exact nature of the rights given for old franchises was defined by the words "shall . . . receive by operation of law in lieu thereof, an indeterminate permit . . . ; and such public utility shall hold such permit under all *the terms, conditions and limitations of this act."*

Note the language; by necessary inference negativing the idea that the legislature contemplated the so-called indeterminate permit would be subject to any condition or limitation such as the two per cent. feature in question or any other of surrendered grants. No limitation or condition was in legislative contemplation, except those "of this act," and except, manifestly, the scope of the privilege itself, and ordinary police regulations. Such privilege, it was thought, obviously, would be measured by the general purpose of the sur-

rendered franchise.   That seems plain because the idea was, the exchange of a privilege held upon specified conditions and limitations named therein or attached thereto for a new one of equal dignity subject only to "the terms, conditions and limitations of this act."

So the thing existing after consummation of an exchange upon which respondent's business was dependable, was the new privilege, emanating directly from the state, denomi- nated an "indeterminate permit;" a permit to do the things theretofore licensed directly by the state and through the municipality as a state agency, but now unconditionally, except as specified in the public utility law.   That it seems was the view of the administrative board in advising the public under date of June 11, 1908, that a permit obtained through operation of the public utility law is as broad as the franchise surrendered.   Report of R. R. Comm. 1908, p. 488.   The idea suggested is that the new thing, as to the activities privileged, is like the old one and referable thereto, as to the scope of the privilege, and referable to the statutes as to conditions and limitations, thus cutting off all previous interferences inconsistent with such statute.   Other administrative suggestions of the commission convey the same idea in letter or spirit.

The foregoing is evidenced by the character of the order of the commission considered by this court in *Superior v. Douglas Co. Tel. Co.* 141 Wis. 363, 122 N. W. 1023, treating a contract between a public utility corporation and the municipality as superseded by the statute.   The decision by the commission was overruled but upon the ground, among others, that the arrangement between the corporation and the city was no part of the franchise; that it was like an ordinary contract which the city and the corporation had power to make in their business capacities.

Inferentially the court held that, except for the fact that the transaction—which was especially burdensome to the corporation—was not one inhering in the public franchise itself

and was of a class especially excepted in the public utility law,—the commission's view of such law was right.

The logic of the decision in *State ex rel. Kenosha G. & E. Co. v. Kenosha E. R. Co.*, ante, p. 337, 129 N. W. 600, wherein the scope of the creation called an "indeterminate permit" and the purpose of the law in question was stated, is in harmony with the foregoing.

Any other meaning of the statute than indicated, it seems, would be contrary to its letter and spirit. The idea that the voluntary surrender of a franchise, containing burdensome conditions and involving complications prejudicial to attainment of the object of the invitation to franchise owners to make the exchange and their object in accepting the invitation,—still leaves such perplexities with efficient vitality attaching thereto and making them a part of the new privilege given for the old one, is so apparently out of harmony with the legislative scheme that unmistakable language to that effect would be required to warrant convicting the legislature of so intending. We find no such language, as we have seen, while, on the contrary, we find quite plain language and the whole spirit of the legislative plan negativing that idea. Doubtless, we reiterate, it was thought that sound policy required old franchises with their multiplicity of differences to be brought under one system so that the things formerly privileged might continue to be so but solely under conditions and limitations referable to a single standard, to wit: the public utility law, with its administrative board to dominate the situation as between the owners of privileges and the public, to the end that each might be coerced, if need be, to deal justly with the other, accomplishing an era of fair exchange of equivalents involving service being furnished customers of the best character and at the lowest price practicable and without discrimination, and rendition therefor of such just and reasonable compensation as under the circumstances of each situation would enable performance of the mutual obli-

gations practicable. To that end the idea evidently was, as indicated, to so disestablish existing conditions as to remove all special rates, favoritisms, and burdens interfering with each customer, on an even plane with any other under like conditions, obtaining service on the basis of reasonable cost plus reasonable profit on account of investment, and unenhanced by anything out of the ordinary in the nature of special features in old grants such as the one in question and, as said before,—referable only to the conditions and limitations of the public utility law.

To round out the plan aforesaid, it seems, making a complete system, encompassing future as well as existing conditions, old franchises were dealt with in one group giving them competency for exchange for new ones to be held subject to "the terms, conditions and limitations of this act," and others were dealt with in a second group, by providing in sec. 1797m—76, that every future grant "shall have the effect of an indeterminate permit subject to the provisions of this act;" power was given to municipalities, in general, in sec. 1797m—87, "to determine by contract, ordinance or otherwise the quality and character of each kind of product or service to be furnished or rendered by any public utility furnishing any product or service within said municipality and all other terms and conditions *not inconsistent with this act,* upon which such public utility may be permitted to occupy the streets or other public property within such municipality," subject to condemnation in whole or in part as void in case of the administrative board determining in due course "the contract, ordinance or other determination" to be unreasonable.

Thus all the features of the law having to do with uniformity to effect the purposes mentioned in sec. 1797m—3 were made to characterize future original grants in sec. 1797m—76 by the words "subject to the provisions of this act" and to characterize all franchises given in exchange for

old ones by the words of sec. 1797m—77 "shall hold such permit under all the terms, conditions and limitations of this act." All were given the name "indeterminate permit," the scope being defined by sec. 1797m—1, subd. 5, having regard, as stated, as to franchises exchanged for existing privileges, to the scope of the latter privilege in each case and such features were likewise made to characterize future arrangements between franchise owners and municipalities by the words of limitation in sec. 1797m—86 "not inconsistent with this act." All are grouped around the one dominant purpose declared in sec. 1797m—3 to be effectuated, making a harmonious scheme to that end; harmony in letter and spirit pervading the whole enactment.

The foregoing analysis of the public utility law seems to demonstrate that retention of the special feature of the surrendered franchise in question as a feature of the new one, differentiating it from indeterminate permits in general, affording appellant, really at the expense of consumers, the benefit of two per cent. of respondent's gross earnings, is plainly inconsistent with "the terms, conditions and limitations" of the public utility law which, as we have seen, it is declared over and over again therein shall characterize every indeterminate permit whether an original grant or a privilege given for an old franchise.

It follows that the order overruling the demurrer to the defense must be affirmed and the one overruling the demurrer to the counterclaim affirmed as well.

*By the Court.*—So ordered.

Barnes, J. (*dissenting*). Sec. 1863, Stats. (Supp. 1906: Laws of 1901, ch. 425), empowers street and interurban railroad companies to run cars in the streets "with the consent of the common council." Such consent "shall be given by ordinance, and upon such terms and subject to such rules and regulations and the payment of such license fees as the com-

mon council . . . may prescribe." In the case of *Manitowoc v. Manitowoc & N. T. Co., ante,* p. 13, 129 N. W. 925, the decisions of various courts involving statutes substantially like that quoted were reviewed, and the conclusion was reached that under such a provision the city might impose. upon a public utility, as a condition upon which its streets might be used, any terms that were not in themselves unlawful. Sec. 1780*b,* Stats. (1898), being the statute here involved, provides that an electric light corporation may use the streets of a city "with the consent of and in the manner agreed upon with the authorities of" the city.

I fail to see where there is any material difference between the provisions of those two statutes and why they are not *in pari materia* so that one should receive the same construction as the other upon the question under consideration. The exaction in the case before us was denominated a tax in the ordinance, but in reality the transaction amounted to an agreement upon the part of the defendant to pay the amount stated for the privilege of using the streets of the city. There was no law prohibiting the city from entering into such an agreement, and I think the city had a perfect right to make it, and the defendant likewise was of the same opinion else it would not have paid the tax for a long series of years. It seems to me to be a mistake to say that the provision quoted from sec. 1780*b* confers only the police power of regulation on cities. Cities under the general police powers conferred on them had this power irrespective of such provision. *State ex rel. Wis. Tel. Co. v. Sheboygan,* 111 Wis. 23, 86 N. W. 657; *Wis. Tel. Co. v. Milwaukee,* 126 Wis. 1, 104 N. W. 1009; *State ex rel. Smythe v. Milwaukee Ind. Tel. Co.* 133 Wis. 588, 114 N. W. 108, 315. Under the grant of general police power a city could not prohibit a public utility operating under a franchise from the state from using its streets. It could only regulate such use. *State ex rel. Wis. Tel. Co. v. Sheboygan, supra.* Does any one doubt that under sec. 1780*b*

the right to use the public streets might be denied to a lighting company organized in the manner provided in that section? Wherein is the difference between the expression "with the consent of . . . and upon such terms" as may be prescribed, in the one statute, and the phrase "with the consent of and in the manner agreed upon," in the other? In either case the city may refuse its consent; in either case there must be an agreement between the parties; and in either case, as I view it, they may agree upon any terms that are not in themselves unlawful.

It seems to me we are in effect though not in words overruling the *Manitowoc Traction Company Case* almost before it has had time to get to the printer. So I feel impelled to dissent from the view of the court herein that this ordinance was invalid in its inception in so far as it required the defendant to contribute two per cent. of its gross income to the city. I also disagree with the other proposition decided in the case.

The indeterminate permit provided for by ch. 499, Laws of 1907, is nothing more nor less than a franchise. That law confers no franchise upon public utilities. Prior to its passage franchises were granted to some public utilities directly by the state by virtue of certain statutes, the statutes defining the nature and extent of the right conferred. Since the passage of the law, franchises, now called "indeterminate permits," are conferred under these identical statutes. Prior to the passage of the law certain other franchises were conferred by local municipalities acting under delegated power from the state. Since its passage indeterminate permits are granted by these local municipalities under this same delegated power. The former statutes under which franchises were granted have been amended in some particulars by the public utilities law. Formerly a time limit was usually fixed. Now franchises are perpetual, subject as before to the legislative right of repeal. All corporations ac-

cepting indeterminate permits by so doing agree to sell the utilities which they own in the manner provided by the 1907 law.   Before its enactment they were not compelled to do so. Where a public utility is acting under an indeterminate permit the local municipality cannot grant a permit to another corporation to engage in the same line of business, unless a certificate is obtained from the railroad commission stating that the public convenience and necessity demand that the second utility be authorized to go into competition with the older corporation.   These in the main are the modifications of existing laws in relation to the granting of franchises that were made by the public utilities law.   We must still go to the statutes in existence when that law was passed to ascertain the scope and extent of the powers conferred on corporations receiving an indeterminate permit since ch. 499, Laws of 1907, became effective, if the permit comes directly from the state.   If it comes from a local municipality we must examine the statute delegating the power to such municipality to grant the particular franchise and to the ordinance passed by virtue of the statute, in order to arrive at the scope of the powers conferred.

Except as the power of a city to impose terms as a condition of granting the right to use its streets is expressly or by reasonable implication taken away by the 1907 law, it exists to the same extent that it did before.   There is no express provision in the law abrogating such power, and I am unable to see where there is any repeal of these former statutory provisions by implication.   There are some obvious advantages in placing the construction on the public utilities law that has been placed thereon in the majority opinion of the court, but this does not argue that the legislative intent has been expressed in that opinion.   Laws are frequently the result of compromises between conflicting interests.   It is a matter of history that the public utilities law as originally drafted was opposed by many of the cities in the state because it would

take away from them the right to determine questions that were assumed to be of local interest only. It was in response to this opposition that sec. 1797m—87, Stats. (Laws of 1907, ch. 499), was incorporated in the law, which section reads: as follows:

"Every municipal council shall have power: (1) To determine by contract, ordinance or otherwise the quality and character of each kind of product or service to be furnished or rendered by any public utility furnishing any product of [or] service within said municipality and all other terms and conditions not inconsistent with this act upon which such public utility may be permitted to occupy the streets, highways or other public property within such municipality, and such contract, ordinance or other determination of such municipality shall be in force and *prima facie* reasonable."

Here we have an express declaration that cities may prescribe the terms and conditions under which a public utility may be permitted to use its streets, provided such terms are not inconsistent with said ch. 499. I fail to see where there is a single requirement of the public utilities law that might not be carried out to its full extent if we were to hold the provisions of the defendant's franchise valid and binding in regard to the payment of the money involved. No provision of that law is pointed out that would conflict with this provision of the ordinance. There is no satisfactory reason why cities may still grant rights and privileges under statutes existing when the public utilities law was passed, but must not couple these rights and privileges with conditions which they are empowered to impose by these same statutes.

Considerable stress is laid on sec. 1797m—77 of the law, which relates to the surrender of its franchise by an existing corporation. It is very apparent that the legislature did not intend to differentiate between an existing corporation electing to come under the law and a new corporation organized after its passage. Where there is a surrender of an existing franchise the corporation receives in lieu thereof an inde-

terminate permit which confers all the rights and imposes all the obligations that were conferred or imposed by the franchise surrendered, except in so far as these rights and liabilities are modified by the public utilities law, and where such law makes no modification of the obligations imposed they remain in full force.