MIGUEL SANTIAGO, Plaintiff and Appellant, *v.* PUBLIC SERVICE COMMISSION OF PORTO RICO and THE WHITE STAR BUS LINE, INC., Defendants and Appellees.

No. 4398.   Argued November 23, 1927.—Decided December 21, 1927.

R. *Martínez Nadal,* M. A. *Martínez Dávila* and L. *Tormes* for the appellant. *George C. Butte,* Attorney General, J. *López Acosta* and R. A. *Gómez,* Assistant Attorneys General, for the Public Service Commission. *Guerra Mondragón & Soldevila* for the White Star Line, Inc.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the court.

Miguel Santiago, the owner of an autobus engaged in carrying passengers between the municipalities of San Juan and Río Piedras under a certificate of convenience and necessity issued by the Public Service Commission of Porto Rico, filed in the District Court of San Juan a petition for an injunction against the said Public Service Commission and the White Star Bus Line, Inc., a corporation organized under the laws of Porto Rico, to enjoin the said defendants from executing any act for putting into effect the franchise granted by the Public Service Commission to the White Star Bus Line, Inc., giving it the exclusive right to the business of carrying passengers between San Juan and Río Piedras.

The plaintiff also petitioned for the issuance of a preliminary writ. A day was set immediately for hearing the parties on this petition. They appeared, evidence was introduced, briefs were filed and on June 21, 1927, the court denied the petition. In stating his ruling the judge suggested that, because of the importance of the questions involved, when the case was ready for trial a motion should be made for a hearing by the court *en banc,* according to the rules of the court. The District Court of San Juan is composed of three judges.

From that ruling the petitioner took the present appeal, which was heard on the 23rd of November, 1927.

Therefore, the only thing before this court is the petition for a preliminary injunction. The district court based its ruling principally on the fact that in its opinion the case

did not show urgency sufficient to warrant a conclusion that it could not await the more careful consideration that must be given to it when it should come up on its merits.

The interlocutory and the primary petitions present the same problems; but what may not have been urgent on June 21, 1927, is urgent now, for, if the petition should not be granted, at the end of this month of December the White Star Bus Line, Inc., will take charge of the business involved to the exclusion of all other persons, including, consequently, the petitioner. And as the parties have argued in writing and orally all of the questions involved, we believe that we should consider and dispose of them in order to clear up the situation, but this does not mean, of course, that the opinion arrived at may not be changed on hearing the evidence and after a more careful and deeper study of it.

Hereafter we shall designate Miguel Santiago as the plaintiff, the Public Service Commission of Porto Rico as the Commission and the White Star Bus Line, Inc., as the White Star Line.

The first question that arises is whether the plaintiff has capacity to bring this action. He contends that he has, both because he is the owner of an omnibus actually engaged in the transportation of passengers under a permit given to him by the Commission and because he is a citizen with the right to pursue a livelihood by the free exercise of his industry or profession.

At the hearing on the preliminary injunction the plaintiff testified that he was the owner of a Federal omnibus worth $4,000 used in the transportation of passengers between San Juan and Río Piedras in accordance with a certificate issued to him by the Commission and good until June 30, 1927. He also testified that in conformity with an order of the Commission the license had been extended to December 31, 1927; that he was disposed to continue in the business and comply with the rules of the Commission; that the certificates or

licenses were granted for six months and renewed for another six months if the rules and the law are complied with, and that up to the time of filing his petition he had not been disturbed in his business, but would have to abandon it completely on December 31, 1927, if the franchise that he was attacking should be put into effect.

Luis Freyre Díaz, an employee of the Commission, testified that the certificates of necessity and convenience issued by the Commission for carrying passengers between San Juan and Río Piedras were renewed at expiration if the holders complied with the requirements of the Commission; that they were not automatically renewed, but by virtue of an order of the Commission.

The certificate in this case was introduced in evidence and reads as follows:

"Case No. cn. 436. Cert. No. 359. Public Service Commission of Porto Rico. Half-yearly License. Itinerary: Tariff: San Juan–Río Piedras. 5 A. M. to 12 P. M.—5¢ San Juan–Martín Peña and 5¢ Martín Peña–Río Piedras.—Quintana Racing Park: San Juan—Quintana 15¢. Stop 15—Quintana 10¢.

"The undersigned Secretary of the Public Service Commission of Porto Rico hereby certifies that Miguel A. Santiago, owner of this motor vehicle, trade name Federal, factory No. 124–6M, license No. P.–54, has complied with all of the requirements of the rules of the Public Service Commission and obtained a certificate of necessity and convenience which authorizes him to operate this vehicle as a common carrier between the points above indicated.

"San Juan, Porto Rico, January 13, 1927. (Sgd.) Francisco del Valle, Jr., Secretary, Public Service Commission.

"The authorized capacity of this vehicle is 22 passengers.

"This license is valid until June 30, 1927.

"Name of omnibus Gold Dust.

"Policy expires January 25, 1927. Certificate expires June 30, 1927. P. R. Am.

"Note: This license can not be transferred without the consent and approval of the Public Service Commission, and it must be posted in a visible place of the vehicle together with the rate and

schedule authorized. (Canceled internal revenue stamp for 25 cents.)''

A certificate of that nature does not constitute the granting of a franchise. It is a strictly regulative measure. It is merely a permit to use a public road. It is a personal license of a revocable nature. *Western Motor Transportation Co.,* P.U.R. 1922 C., p. 13; *Oro Electric Corporation* v. *Commission,* 169 Cal. 456; *Troy Auto Co.,* P.U.R. 1917 A, p. 700; Babbit on The Law Applied to Motor Vehicles, sec. 209.

But in this case not even the efficacy of the permit is involved. It had full effect. It was in force during the whole period fixed therein. It was in no way revoked by the Commission, nor obstructed by the White Star Line. It was effective only until June 30, 1927. If the plaintiff continued the business after June 30th, it was by permission granted to him by the Commission in the same franchise that is attacked.

Such being his understanding of the matter, the plaintiff contends that the permit was renewable if the rules of the Commission were complied with and that, as he was willing to comply with those rules, the permit would be renewed necessarily and he could continue to engage in the business after December 31, 1927, but for the franchise granted to the White Star Line.

The permit does not contain anything about renewals. Witness Freye did not say that the permits were renewed automatically, or that the Commission was bound to renew them. What was issued was a new permit also for a limited period. The idea of renewal arises from the continuation of the business, but in fact a different permit was involved in each case.

Neither the permit that expired on June 30, 1927, nor the alleged right to its renewal is therefore sufficient to enable the plaintiff to prosecute this action with success.

Let us see if in placing them on the broader basis of the

plaintiff's right as a citizen to continue engaging in the free exercise of his business, they give the plaintiff the necessary capacity to resort to the courts and to obtain from them the relief sought.

In the case of *Allgeyer* v. *Louisiana,* 165 U. S. 578, 589, cited in *People* v. *Correa,* 31 P.R.R. 504, Mr. Justice Peckham, speaking for the court, said:

"It was said by Mr. Justice Bradley, in *Butchers' Union Company* v. *Crescent City Company,* 111 U. S. 746, 762, in the course of his concurring opinion in that case, that 'The right to follow any of the common occupations of life is an inalienable right. It was formulated as such under the phrase "pursuit of happiness" in the Declaration of Independence, which commenced with the fundamental proposition that "all men are created equal, that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty and the pursuit of happiness." This right is a large ingredient in the civil liberty of the citizen.' Again, on page 764, the learned justice said: 'I hold that the liberty of pursuit—the right to follow any of the ordinary callings of life—is one of the privileges of a citizen of the United States.' And again, on page 765: 'But if it does not abridge the privileges and immunities of a citizen of the United States to prohibit him from pursuing his chosen calling, and giving to others the exclusive right of pursuing it, it certainly does deprive him (to a certain extent) of his liberty; for it takes from him the freedom of adopting and following the pursuit which he prefers; which, as already intimated, is a material part of the liberty of the citizen.' It is true that these remarks were made in regard to questions of monopoly, but they well describe the rights which are covered by the word 'liberty' as contained in the Fourteenth Amendment.

"Again, in *Powell* v. *Pennsylvania,* 127 U. S. 678, 684, Mr. Justice Harlan, in stating the opinion of the court, said: 'The main proposition advanced by the defendant is that his enjoyment upon terms of equality with all others in similar circumstances of the privilege of pursuing an ordinary calling or trade, and of acquiring, holding and selling property, is an essential part of his rights of liberty and property, as guaranteed by the Fourteenth Amendment. The court assents to this general proposition as embodying a sound principle of constitutional law.'"

Under the foregoing doctrine the capacity of the plaintiff to seek relief in the courts must be recognized. He is a citizen who has invested his money in the purchase of an omnibus for engaging in a lawful business by obeying the law with the hope of continuing in the business, and he would be deprived of that business if the franchise involved went into full force.

This point decided, let us see whether or not the remedy by injunction elected by the plaintiff is appropriate.

The defendant Commission was created by the Congress of the United States in 1917. Section 38 of our Organic Act reads as follows:

"That all grants of franchises, rights and privileges of a public or quasi public nature shall be made by a public-service commission, consisting of the heads of executive departments, the Auditor, and two commissioners to be elected by the qualified voters at the first general election to be held under this Act, and at each subsequent general election thereafter. The terms of said elective commissioners elected at the first general election shall commence on the twenty-eighth day following the said general election, and the terms of the said elective commissioners elected at each subsequent general election shall commence on the second day of January following their election; they shall serve for four years and until their successors are elected and qualified. Their compensation shall be $8 for each day's attendance on the sessions of the commission, but in no case shall they receive more than $400 each during any one year. The said commission is also empowered and directed to discharge all the executive functions relating to public-service corporations heretofore conferred by law upon the Executive Council. Franchises, rights, and privileges granted by the said commission shall not be effective until approved by the Governor, and shall be reported to Congress, which hereby reserves the power to annul or modify the same.

"The interstate-commerce Act and the several amendments made or to be made thereto, the safety-appliance Acts and the several amendments made or to be made thereto, and the Act of Congress entitled 'An Act to amend an Act entitled "An Act to regulate commerce", approved February fourth, eighteen hundred and eighty-seven, and all Acts amendatory thereof, by providing for a valuation of the several classes of property of carriers subject thereto and secur-

ing information concerning their stocks, bonds, and other securities,' approved March first, nineteen hundred and thirteen, shall not apply to Porto Rico.

"The Legislative Assembly of Porto Rico is hereby authorized to enact laws relating to the regulation of the rates, tariffs, and service of public carriers by rail in Porto Rico, and the Public-Service Commission hereby created shall have power to enforce such laws under appropriate regulation."

And in the same year (1917) the Legislature of Porto Rico enacted Act No. 70 defining public service companies and providing for their regulation; prescribing, defining, regulating and limiting their rights, powers and duties; prescribing and defining the powers and duties of the Public Service Commission and its officers; prescribing and regulating the practice and procedure before that commission and upon appeal, and for other purposes.

That Act is a full and complete piece of legislation that begins by saying what are public service companies and ends by regulating the practice and procedure before the Commission and on appeal. According to its section 2 the plaintiff himself constitutes a public service company, because for the purposes of the Act "public-service companies shall be such natural persons or bodies corporate as may engage in Porto Rico in any of the following pursuits or businesses: (a) Transportation of persons or freight using in whole or in part marine, fluvial or land routes ... ." And the White Star Line is another.

In conformity with the provisions of that Act the franchise issued to the White Star Line should have been granted by following the procedure therein established. And it seems logical that in order to attack it the procedure also established in the Act should have been followed by taking the corresponding appeal to the District Court of San Juan.

"No injunction shall issue modifying, suspending, staying or annulling any order of the commission or of a commissioner, except upon notice to the commission and after cause shown upon a hear-

ing. The District Court of San Juan, Section 1, is hereby clothed with exclusive jurisdiction throughout Porto Rico of all proceedings for such injunctions, subject to an appeal to the Supreme Court as aforesaid.'' Section 91 of Act No. 70, *supra.*

If the procedure established by the Act had been followed and within it the writ of injunction had been petitioned for, the district court would have had the benefit of a copy of all of the proceedings before the Commission and would have been in a better position to do justice.

But leaving aside this question, without holding that the defendant is wrong in raising it, we will proceed to consider the two really fundamental questions involved in the action, namely: Was the Commission duly constituted when the franchise was granted? If so, did it have power to grant it in the manner in which it was granted?

As organized in accordance with section 38 of the Organic Act and Act No. 70 of 1917, the Commission acted on April 9, 1927, by granting the franchise. The plaintiff contends that as on that date the Act of the Congress of the United States ''to amend and reenact sections 3, 20, 31, 33, 38 and 48 of the Act of March 2, 1917, entitled 'An Act to provide a civil government for Porto Rico and for other purposes,' as amended by an Act approved June 7, 1924, and for the insertion of a new section in said Act between sections 5 and 6 of said Act, to be designated as '5 *a*' of said Act,'' approved on March 4, 1927 (44 United States Statutes at Large, Part Second, 1418) and generally known as the Butler Act, was in full force and effect, the Commission acted without any authority and the franchise granted by it is completely void.

The averment of the plaintiff with regard to the dates of the granting of the franchise and of the approval of the Butler Act is correct, and it is true that the Commission which granted the franchise was the one constituted under the Organic Act of 1917 and Act No. 70 to which we have referred.

In our judgment it is of decisive importance to determine whether the Butler Act abolished the Commission created by the Organic Act, as the plaintiff claims, or merely reorganized it.

We have quoted its title and it seems well to copy section 38 as it was thereby "amended and reenacted." It reads as follows:

"That all grants of franchises, rights, privileges, and concessions of a public or quasi public nature shall be made by a public service commission consisting of a public service commissioner, who shall be the president of the said commission, and two associated commissioners, to be appointed by the governor with the advice and consent of the senate. The Public Service Commissioner shall be appointed for a term of three years and until his successor shall be appointed and shall have qualified, and one of the said associated commissioners, first appointed, shall hold for a term of two years and one shall hold for a term of one year; and thereafter, each of said associate commissioners shall hold for a term of three years and until their successors shall have been appointed and shall have qualified; Provided, That the present elective members of the said commission shall continue to be members of said commission until their term of office expires as now provided by law and shall form the commission, together with the three members appointed by the governor as aforesaid, until the expiration of such period of their services and not thereafter. The salary of the commissioner shall be $6,000 a year and the said commissioner shall devote his entire time to his duties as such commissioner. The compensation of the associated members, both those elected and appointed, shall be $10 for each day's attendance at the sessions of the commission; but in no case shall they receive more than $1,000 during any one year. The said commission is empowered and directed to discharge all the executive functions relating to public service corporations heretofore conferred by law upon the executive council and such additional duties and functions as may be conferred upon said commission by the legislature. Franchises, rights, and privileges granted by the said commission shall not be effective until approved by the governor and shall be reported to Congress, which hereby reserves the power to annul or modify the same.

"The Interstate Commerce Act and the several amendments made or to be made thereto, the Safety Appliance Acts and the several

amendments made or to be made thereto, and the Act of Congress entitled 'An Act to amend an Act entitled "An Act to regulate commerce," approved February 4, 1887, and all Acts amendatory thereof, by providing for a valuation of the several classes of property of carriers subject thereto and securing information concerning their stocks, bonds, and other securities,' approved March 1, 1913, shall not apply to Porto Rico.

"The legislative assembly of Porto Rico is hereby authorized to enact laws relating to the reglation of the rates, tariffs, and service of all public carriers in Porto Rico, and the public service commission hereby created shall have power to enforce such laws under appropriate regulation."

Judging by the title of the Act and the contents of the amendment, the Commission was not abolished, nor changed in its purposes in such a way that it might be considered that the intention of Congress was to create an organization distinct from the other. The commission was reorganized and nothing more. In his report on the bill Senator Butler said:

"In the new organization the chairman of the commission will devote his time to the commission's work exclusively and will receive a compensation . . . It is believed that this organization will be workable and practicable and that the difficulty arising out of the present organization will completely disappear. No change of any sort has been made in regard to duties and powers of the commission."

Under section 38 as worded before the amendment the heads of the executive departments of the Government and the insular Auditor formed a part of the Commission, with two other commissioners elected by the People. Life in Porto Rico is day by day becoming more intense. Experience showed that it was impossible for officials so occupied as those who conduct the insular administration to act on a commission of such great importance as the Public Service Commission. Hence the change, which Congress in its wisdom also extended to the elective officers, but recognizing

to those already elected the whole term for which they were commissioned by their constituents.

It could not be expected that the Governor would select immediately the new members of the Commission, for that required careful inquiry on his part, and the advice and consent of the Senate. Complicated matters that had been under consideration for a long time were pending. The two members of the Commission elected by the voters would continue in office, as has been said, for about two years more and the other members of the Commission were such by reason of the public offices which they discharged and would continue to act on the Commission notwithstanding the amendment to the law. Under such circumstances the Commission decided to continue acting in order to dispose of the matters pending before it, one of which was the franchise now under consideration.

Nothing contrary to the course taken is expressly provided by the Butler Act. It was to be incorporated into the Organic Act, and we consider well founded the argument of the appellees that, since such was the case and the Act as amended was in force in its entirety, section 56 was applicable, providing, among other things, the following:

"That this Act shall take effect upon approval, but until its provisions shall severally become operative, as hereinbefore provided, the corresponding legislative and executive functions of the government in Porto Rico shall continue to be exercised and in full force and operation as now provided by law . . ."

In the case of *Farrell* v. *State,* 24 Atl. Rep. 725, the Supreme Court of New Jersey said:

"A statute which is amended is thereafter, and as to all acts subsequently done, to be construed as if the amendment had always been there, and the amendment itself so thoroughly becomes a part of the original statute that it must be construed in view of the original statute as it stands after the amendments are introduced, and the matters superseded by the amendments eliminated."

The Act of 1917 is at present the Constitution of Porto Rico and it seems just, logical and proper to apply the method outlined by it in solving the problem that arose. It is inconceivable that the intention of Congress was to stop the operation of the Commission created by itself until the new appointments were made. A reasonable interval of time had to be allowed for reorganizing the body and while the reorganization was being effected it was natural and correct that the Commission should continue to act as it was constituted.

In reference to the reorganization of municipalities which, as it is known, are creations of the Legislature as the Commission is the creation of Congress, precedents may be found to sustain the conclusion that the Commission had a right to continue acting until the new appointments were made. It seems proper to say, before citing some of those cases, that the time taken by the Governor in appointing the new members was not unreasonable. We believe that on this point no question is raised by the plaintiff.

"The mere proclamation of the governor changing the form of a city of the third class to a city of the second class does not leave the city without a city government; and, of necessity, until the officers of the new city, as a city of the second class, qualify, the old form of government and the old officers will continue. Campbell v. Braden, 3 Pac. Rep. 542, 31 Kan. 754; Ritchie v. City of South Topeka, 16 Pac. Rep. 332, 38 Kan. 370." *Stewart* v. *Adams* (Kan.), 32 Pac. 123.

And in the earlier case of *Ritchie* v. *City of South Topeka,* 16 Pac. Rep. 332, the same court said:

"What was the *status* of the city of South Topeka at this time? It was declared to be a city of the second class by the governor's proclamation of June 4, 1886, but its municipal government was not fully organized until some time after that date. In *Campbell* v. *Braden,* 31 Kan. 754, 3 Pac. Rep. 542, this court suggests that it necessarily requires time for such organization to be completed, and in this case we cannot say there was an unreasonable delay.

It would not be completed until its officers, including the councilmen, were elected. The proper evidence of their election would be the canvass of the vote by the proper authorities. This was not done at the time of the levying of this tax; and therefore the city of South Topeka at that time was acting, so far as its officers were concerned, as a city of the third class. It is necessary that there should be some city government at all times, and the mere proclamation of the governor changing the form of the city from a city of the third to a city of the second class, did not leave the city without a city government, and of necessity, until the officers of the city as a city of the second class qualified as such officers, the old form of government, and the old officers, would continue. We think that the ordinance complained of was valid.''

There is no doubt, then, that the Commission as constituted could act. Now, had it authority to grant the franchise?

The problem involves two propositions. It is alleged by the plaintiff that under the terms of section 38 of the Organic Act of 1917 as worded before the amendment the Commission had power only to regulate the service of common carriers by railroad, and it is further contended that although it had power to regulate all kinds of carriers, that power would never extend to the granting of a monopoly such as that conceded in this franchise.

With relation to the first proposition, it is true that section 38 of the Organic Act expressly authorizes the Legislative Assembly to enact laws relating to the regulation of the rates, tariffs and service of all public carriers by rail in Porto Rico and empowers the Commission to enforce such laws under appropriate regulation, but in our judgment that authority, appearing in the last paragraph of the section, was granted as a consequence of the provision of the preceding paragraph in relation to the inapplicability to Porto Rico of the Interstate Commerce Act and its amendments and the Safety Appliance Acts to which the preceding paragraph refers.

The first part of section 38 is broad. It prescribes that ''all grants of franchises, rights, privileges, and concessions

of a public or quasi public nature shall be made by a public service commission. . .'' And the Legislature of Porto Rico, which in this particular has powers similar to those of any state of the Union, with the only limitation that its laws may be annulled by Congress, in the same year of 1917 passed Act No. 70, to which we have heretofore referred, subjecting all companies engaged as common carriers in general to the jurisdiction of the Commission. Perhaps it may be well to cite section 52 of said Act No. 70 which begins as follows:

"The commission shall have power to grant franchises, rights, privileges or concessions for public or quasi-public purposes, including the right to use, or cross roads, highways and public streams . . . ''

In the case of *Kane* v. *State of New Jersey*, 242 U. S. 160, the Supreme Court of the United States said:

"The power of the State, in the absence of national legislation upon the subject, to regulate the use of its highways by motor vehicles moving in interstate commerce, applies as well to such as are moving through the State as to such as are moving into it only."

Then, the special authorization of Congress was not necessary. The power resided in the Legislature to which Congress, in section 25 of the Organic Act, granted all local legislative powers in Porto Rico, and the Legislature could delegate its powers to the Commission.

"Power to make laws is vested in the legislature, under the constitutions of all of the states, and it has been thought to be very doubtful whether the legislative department can delegate to any other body or authority the power to grant franchises, inasmuch as the exercise of that power involves a high trust created and conferred for the benefit of those who granted it, and the trust is confided to the legislature. It seems to be settled, however, that state legislatures may not only exercise their sovereignty directly, but may delegate such portions of it to inferior legislative bodies as, in their judgment, are desirable for local purposes." 12 R.C.L. 187.

The fact that in amending said section 38 the Butler Act

substituted the words "public carriers by rail" by the words "all public carriers," can have no greater extent than to remove any doubt that might be entertained. We do not believe that to this case is applicable the maxim *Expressio unius est exclusio alterius,* for we have said that the paragraph referred to is logically applicable as a complement of the preceding one. At any rate, it may be held that the amendment was already in force when the Commission acted upon the matter, although constituted as it was.

The second proposition covers a broader field of investigation.

The franchise under consideration grants to the White Star Line the exclusive right to carry passengers in omnibuses between San Juan and Río Piedras over the streets and public roads under certain conditions and subject to the control of the Commission. On the date on which the franchise goes into effect the certificate of necessity and convenience of the plaintiff to which we have referred and the extension granted to him by the franchise itself will have become extinguished.

In the franchise the plaintiff is given the means of selling his omnibus. On the White Star Line is imposed the duty of buying it at a reasonable price. If any disagreement should arise about the price, the Commission would act as arbitrator. This does not mean that the plaintiff is obliged to sell. He can dispose of his property in any other way. What it means is that in the franchise all precedents were taken into account and it provided for an equitable adjustment of all rights involved.

For the purposes of this case it may be admitted that the Commission granted to the White Star Line a monopoly of the service of carrying passengers. Had the Commission that power?

When the Congress of the United States created a Public Service Commission in Porto Rico it must have had the

intention of establishing in this Island the modern method of deciding questions relating to public service companies that had been operating long before in many states of the Union. There are certain businesses that are or tend to be, of their own nature, monopolies. The community suffered from abuses which the operation of such monopolies implied. It was believed that the true solution consisted in that the exploitation of such businesses should be taken charge of by the Government itself. However, experience showed that the solution was also very risky and then arose the idea of creating certain commissions having the power to regulate, direct and control the said businesses which should continue to be carried on by citizens, either personally or in corporations.

Massachusetts was the first state to adopt that form of commission. In the case of *Weld* v. *Gas & Electric Light Com'rs.*, 84 N. E. 101, the Supreme Court of that state said:

"In the first place, in reference to this department of public service, we have adopted, in this state, legislative regulation and control as our reliance against the evil effects of monopoly, rather than competitive action between two or more corporations, where such competition will greatly increase the aggregate cost of supplying the needs of the public, and perhaps cause other serious inconveniences . . . The state, through the regularly constituted authorities, has taken complete control of these corporations so far as is necessary to prevent the abuses of monopoly . . . In reference to some kinds of public service, and under some conditions, it is thought by many that regulation by the state is better than competition."

Other states enacted laws similar to that of Massachusetts and the courts interpreted them liberally so that the intention could be shown clearly. It will suffice to quote what the Supreme Court of Wisconsin said in the case of *City of La Crosse* v. *La Crosse Gas & Electric Co.*, 130 N. W. 530, 534:

"The magnitude of the task was great. Few, if any, greater have been dealt with in our legislative history. The result stands significant as a monument to legislative wisdom. That such a com-

plicated situation has been met by written law in such a way as to avoid successful attack up to this time, on the validity of the law . . . ''

Thus, under the new system the difficult problems created especially in relation to public transportation are being solved by granting franchises through which the business has been put in the hands of a single management under the immediate supervision of the Commission that represents the interests of the public and should be expected to protect them faithfully.

The franchise granted by the Commission in this case had to be approved after an investigation of the existing conditions. It is not alleged in the complaint that such an investigation was not made, and the conclusion reached by the Commission is not in itself illegal, unjust, unusual or arbitrary. It was truly extreme, but apparently it is the most logical manner of solving the problem for the welfare of the community as a whole. It was within the powers of the Commission and gives the plaintiff, as has been said, an equitable means of reimbursing himself for the value of the property which he had put into the business.

The consideration of the court can not extend beyond this point, especially as this case involves only the granting of a preliminary injunction, following the course outlined by the Supreme Court of the United States in the case of *New York* v. *McCall,* 245 U. S. 345, as follows:·

"The Court of Appeals of New York decided that the Public Service Commission was created to perform the important function of supervising and regulating the business of public service corporations; that the state law assumes that the experience of the members of the Commission especially fits them for dealing with the problems presented by the duties and activities of such corporations; that the courts in reviewing the action of the Commission have no authority to substitute their judgment as to what is reasonable in a given case for that of the Commission, but are limited to determining whether the action complained of was capricious or arbitrary and for this reason unlawful; and that it was clearly within

the power of the Commission to make the order which is here assailed.

"This interpretation of the statutes of New York is conclusive, and the definition, thus announced, of the power of the courts of that States to review the decision of the Public Service Commission, based as it is in part on the decision in *Interstate Commerce Commission* v. *Illinois Central R. R. Co.*, 215 U. S. 452, 470, differs but slightly, if at all, from the definition by this court of its own power to review the decisions of similar administrative bodies, arrived at in many cases in which such decisions have been under examination. . . . .

"It is the result of these and similar decisions, that while in such cases as we have here this court is confined to the federal question involved and therefore has not the authority to substitute its judgment for that of an administrative commission as to the wisdom or policy of an order complained of, and will not analyze or balance the evidence which was before the Commission for the purpose of determining whether it preponderates for or against the conclusion arrived at, yet it will, nevertheless, enter upon such an examination of the record as may be necessary to determine whether the federal constitutional right claimed has been denied, as, in this case, whether there was such a want of hearing or such arbitrary or capricious action on the part of the Commission as to violate the due process clause of the Constitution.

  *   *   *   *   *   *   *

"Corporations which devote their property to a public use may not pick and choose, serving only the portions of the territory covered by their franchises which it is presently profitable for them to serve and restricting the development of the remaining portions by leaving their inhabitants in discomfort without the service which they alone can render. To correct this disposition to serve where it is profitable and to neglect where it is not, is one of the important purposes for which these administrative commissions, with large powers, were called into existence, with an organization and with duties which peculiarly fit them for dealing with problems such as this case presents, and we agree with the Court of Appeals of New York in concluding that the action of the Commission complained of was not arbitrary or capricious, but was based on very substantial evidence, and therefore that, even if the courts differed with the Commission as to the expediency or wisdom of the order, they

are without authority to substitute for its judgment their views of what may be reasonable or wise.''

For a broader study of the questions involved see volume 42 of Corpus Juris recently published. It devotes more than eight hundred pages to ''Motor Vehicles.'' Especially on pages 616, 620, 641, 643, 648, 650, 651, 656, 681, 684 and 710 may be found abundant citations in support of the principles on which this opinion is based.

Therefore, the order appealed from should be affirmed.

Mr. Justice Wolf dissented.

### DISSENTING OPINION OF MR. JUSTICE WOLF.

This was a case wherein an ordinance, or franchise, granted by the Public Service Commission was to take effect within a few weeks when the review of the order of the District Court of San Juan denying the injunction was made a duty of this court. I have not had the necessary amount of time to consider or collect all the authorities or to attempt to exhaust the field.

The defendants in the court below presented various objections to the remedy of injunction sought by the plaintiff. It was said, for example, that no showing was made that the plaintiff would be deprived of any right by reason of the granting of the ordinance in this case. Given the fact that the ordinance itself provided for an exclusive right in the White Star Line to use motor busses on the high road of Porto Rico between San Juan and Río Piedras, and given the fact that the said ordinance undertook to refuse to give a certificate of convenience and necessity to any other motor busses covering the same route, I think the plaintiff, who had been operating motor busses for years and who had hitherto complied with all the regulations imposed by the commission, made out a case of injunction. His business in the particular locality where he was operating was inevitably destined to be destroyed. While in certain cases or in certain

jurisdictions he might have a remedy by mandamus, yet the proposed granting of a monopoly by the Public Service Commission was such a momentous fact that, if the Public Service Commission had no right to grant such an exclusive right, no other remedy would be so adequate or efficacious as an injunction. That injunction is the proper remedy in this class of cases the following authorities will show: Section 3 of the Act of March 8, 1906; *City of Hammond, Petitioner,* v. *Echappi Bus Line, Inc.,* decision of the Supreme Court of the United States, November 21, 1927; *City of Hammond, Petitioner,* v. *Farina Bus Line,* decision of the Supreme Court of the United States, November 21, 1927. Same cases as decided by the Circuit Court of Appeals, Seventh Circuit, 11 Fed. (2nd) 940, 943; 32 Corpus Juris 234; 42 Corpus Juris, *passim* and 657, notes 25 and 27. Relief by injunction covers threatened injuries.

The defendants were insisting that the existing Public Service Commission had not refused to issue a certificate to the appellant, but the answer of the defendant, the Public Service Comission, sufficiently shows that it had accepted all the acts of the prior Public Service Commission and was about to put them into effect.

So far as at present advised, I agree with the court that the Public Service Commission, as constituted when this ordinance was passed or the franchise granted, was an existing organization and was not extinguished by the so-called Butler Act. A reading of that Act shows that Congress intended a continuance of the Public Service Commission as such and only reorganized the members who composed it. My differences with the majority-of the court are principally on the merits of the case.

The grant of the monopoly sought to be established is an attempted exercise of the police power of the state. While I am aware that under special circumstances, especially in cities, monopolies may arise by granting franchises to one

person and refusing them to others along certain routes, *Modeste* v. *Conn. Co. et al.*, 117 Atl. 494, yet I have found no case wherein a monopoly has, in direct and specific terms, been granted and intended; nor do I find any case where on the principal and most traveled route of a community a monopoly has been sought to be established either by legislature, municipality or public service commission. On a principal public way there should be an equality of opportunity and no motor bus or company should be given a decided preference over other persons plying the same trade. I am fairly well satisfied that no satisfactory reason has been shown for the creation of a monopoly, if it could be shown.

Assuming, with the court, that the police power does extend so far, it is a matter for the Legislature to determine whether the monopoly should be granted. Despite their broad powers, public service commissions, I apprehend, are administrative bodies. Of course there are certain administrative powers which run close to the line. This court considered some of them in *People* v. *Neagle*, 21 P.R.R. 339, where certain administrative powers of the Treasurer were involved, but the monopoly here sought to be established is not an act of administration. This is a highly important matter in which not only the owners of motor busses have an interest, but also the general public in its right to travel. The interested total public has a right to have the Legislature determine whether the necessity for a monopoly has arisen.

The monopoly sought to be established in the public travel of Porto Rico and other features of the ordinance are in the nature of legislation. The Legislature can not and has not delegated these legislative powers to the Public Service Commission. In Porto Rico we have a republican form of government. Constitution of the United States, section 40 of the Foraker Act, its continuance in force by the Jones Act, and other provisions of the Organic Act of Porto Rico. In a republican form of government the right to establish or

create a monopoly under this or similar conditions must in the first instance reside in the Legislature and not in the Public Service Comission.

Under Act No. 70 of 1917 the Legislature authorized the Public Service Commission to ''regulate'' and control travel over the public roads. Section 52 of said Act, vol. II, page 512, provides as follows:

''The commission shall have power to grant franchises, rights, privileges or concessions for public or quasi-public purposes, including the right to use, or cross roads, highways and public streams; and to grant franchises, rights, privileges or concessions for the use of public waters for public or private purposes; *Provided,* That the commission shall not have the power to grant the title or use of public lands or property, or to grant franchises, rights, privileges or concessions for private purposes, except for the use of public waters, without the approval of the Legislature.''

While the Legislature did under section 39 authorize the commission to regulate the public service, it did not, as I understand it, authorize the said commission to establish this monopoly.

If the idea for granting the franchise is congestion or the fear of congestion, there is no indication that congestion will be relieved by a single control. One of the conditions of the franchise proposed to be granted is that the White Star Line should maintain as many motor busses as the Public Service Commission may require. The congestion, it seems to me, would not be affected. If the idea is a lack of financial responsibility in the average owner of a motor bus, this lack could be corrected, as it has been in many other places, by requiring the owner of a motor bus to furnish an adequate bond. Neither the ordinance nor the record showed the reasons or necessity for the creation of a monopoly in Porto Rico.

It has been maintained or suggested that the right to use motor busses is in the nature of a natural monopoly. Unless all the traffic is to be controlled, I can not quite get this idea

of natural monopoly. In addition to motor busses, private trucks, freight trucks and automobiles of all kinds travel over the public roads. It is different where water mains, gas mains, or electric mains are to be built.

Great stress has been laid on the fact that, with respect to other utilities,—railroads, electric light companies, gas companies and the like,—monopolies have been frequently granted. Many of these are in the nature of natural monopolies, but all of them seek and obtain from the government or municipality rights or privileges other than the right to travel on a high road which has existed from time immemorial. A railroad company, while it crosses public roads, in the main does not travel on them, and the case is not parallel. The railroad company, besides, obtains a right to condemn land. All these companies obtain special privileges from the state which preserves the right to create monopolies.

Courts will take judicial notice of the condition of the public roads. Nothing has been drawn to my attention of which the court could take judicial notice which would, under present conditions, require the creation of a monopoly. I go further and say that so far I think the court could take judicial notice that there is no reason for creating a monopoly.

Inasmuch as a monopoly is an extraordinary thing in the line of public travel on regularly used highways, when the plaintiff showed, among other things, that a monopoly was about to be created he established a *prima facie* case. If there was any possibility of showing the necessity for a monopoly the burden was upon the Public Service Commission to show such necessity, supposing it had the power. I maintain that under the circumstances it was for the courts of Porto Rico to decide whether a necessity for a monopoly existed; that it was a judicial question and that there is no presumption under the facts in favor of the correctness of the ordinance in establishing a monopoly.

The authorities tend to show that if an applicant for a

certificate to operate a motor vehicle or motor bus complies with all the regulations he has a right by mandamus or otherwise to compel the Public Service Commission to grant him such a certificate. The appellees say that the granting or revocation of a permit is within the discretion of the Public Service Commission. It is a kind of discretion that must be reasonably exercised, and the courts will proceed against any unreasonable or arbitrary exercise of it. Under ordinary conditions a discrimination, as in the present case, would be an unreasonable exercise of the discretion.

Reading the majority opinion, one would infer that the plaintiff could perhaps obtain relief at a final hearing. By that time, if the ordinance was enforced, he would probably be excluded from the road. The object of a preliminary injunction is to preserve the *status quo* while the parties are debating important rights. The business of the plaintiff might be totally destroyed. The district court indicated in June that a hearing might be had by the court, in bank. If there was thus sufficient doubt in the two courts, it seems to me the proper thing would have been to preserve the rights of the plaintiff pending the decision. I have some idea that this would have been the attitude of the Supreme Court of the United States, as indicated by the *Schappi* and *Farina Cases,* cited at the beginning of this opinion. In those cases, it is true that the injunctions had been granted in the lower court, but the spirit of these decisions, I think, favors my position.

For the foregoing considerations I dissent from the opinion of the court.